```
 1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF NEBRASKA
 2

 3   UNITED STATES OF AMERICA,      )    Case No. 4:17CR3089
                                    )
 4            Plaintiff,            )
                                    )
 5   vs.                            )
                                    )
 6   RODNEY P. MAZZULLA,            )
                                    )    Lincoln, Nebraska
 7            Defendant.            )    August 1, 2018

 8

 9

10            TRANSCRIPT OF SENTENCING PROCEEDINGS
              BEFORE THE HONORABLE JOHN M. GERRARD
11                UNITED STATES DISTRICT JUDGE

12

13                  A-P-P-E-A-R-A-N-C-E-S

14   FOR THE PLAINTIFF:        Ms. Sara E. Fullerton
                               Assistant United States Attorney
15                             100 Centennial Mall North
                               Suite 487, Federal Building
16                             Lincoln, NE 68508-3865

17

     FOR THE DEFENDANT:        Mr. Gregory C. Damman
18                             Blevens & Damman
                               129 North 5th Street
19                             P.O. Box 98
                               Seward, NE 68434
20

21   COURT REPORTER:          Ms. Rogene S. Schroder, RDR, CRR
                               111 South 18th Plaza
22                             Suite 3129
                               Omaha, NE 68102
23                             (402) 661-7383

24

     Proceedings recorded by mechanical stenography, transcript
25   produced with computer.
```

1           (At 10:07 a.m. on August 1, 2018; with counsel and the

2     defendant present:)

3           THE COURT:  Good morning to everyone.  We're on the

4     record in United States of America versus Rodney Mazzulla.

5     This is Case Number 4:17CR3089.  This matter comes on for

6     sentencing with respect to Count I, which was the conspiracy to

7     distribute 50 grams or more of methamphetamine, actual;

8     Count II, possession with intent to distribute five grams or

9     more of methamphetamine, actual; and Count V, possession with

10    intent to distribute 50 grams or more of methamphetamine,

11    actual.

12         Counsel, would you please enter your appearance.

13           MS. FULLERTON:  Your Honor, I'm Assistant United

14    States Attorney Sara Fullerton representing the government.

15           MR. DAMMAN:  Greg Damman appearing for Mr. Mazzulla.

16           THE COURT:  All right.  Mr. Mazzulla is present in

17    the courtroom today.

18         The record should also reflect that the probation officer,

19    Sandra Foster, appears by telephone.

20         Are you still there, Sandra?

21           PROBATION OFFICER:  Yes, sir.

22           THE COURT:  Okay.  Thank you for your patience.

23         Mr. Damman, may I confirm with you that you've received

24    the Revised Presentence Investigation Report dated July 5 of

25    2018 and you've gone over the report and the Sentencing

1    Recommendation with your client?

2              MR. DAMMAN:  Yes, Your Honor.  I have.

3              THE COURT:  All right.  Very well.  This matter was

4    tried to a jury so there was no plea agreement in this case.

5         So that takes us back to the presentence report again.

6    There are no motions that require resolution to sentencing.

7    We'll take up the 3553(a) factors at allocution and sentencing.

8    The defendant has objected to the revised PSR.

9         Now, before we get to those objections -- there are four

10   objections -- I will advise the parties straight up that

11   obviously I was the trial judge in this particular case.  I had

12   an opportunity to view the witnesses, assess credibility, and

13   with that said, the evidence supports and I will respect the

14   jury's verdict in all -- in all regards.

15        Thus, I will hear arguments of counsel this morning, but I

16   want to tell everyone we're not going to retry this case.  This

17   case has been tried once.  Therefore, as to some of the

18   objections, with respect to the defendant's objection with

19   regard to the firearm enhancement, I believe -- the Court

20   believes it certainly has weight.  The government will have an

21   uphill climb on that particular objection.

22        On the other hand, the defendant's objections to the drug

23   quantity have an equal uphill trajectory, but I'm just stating

24   that.  I will hear arguments of both counsel as to -- as to all

25   matters, but it appears to me that if there's going to be

1    further evidence or live testimony, it should be focused on the

2    obstruction of justice enhancement.

3         Now, with that said, there are four objections so let's

4    take them one at a time.  The first one was the defendant

5    objected to the actual versus mixture of methamphetamine.  And

6    I handled that particular objection tentatively overruling it

7    in paragraph 2(a) of my tentative findings.

8         Counsel, do you wish to argue that any further?  Now,

9    first from the -- it's your --

10              MR. DAMMAN:  No, Your Honor.

11              THE COURT:  Okay.  Anything from the government?

12              MS. FULLERTON:  No, Your Honor.

13              THE COURT:  All right.  Then my -- my ruling -- that

14   objection will be overruled for the reasons stated in my -- on

15   page 2 of my tentative findings at paragraph 2(a).

16        With respect to the dangerous weapon or firearm, a

17   two-level enhancement, that's under Guideline Section

18   2D1.1(b)(1), I will -- I will hear any further evidence or

19   argument with -- with respect to -- to that.

20              MS. FULLERTON:  Your Honor, in support of the gun

21   enhancement, I would offer Exhibit 59 and -- which is a table

22   of citations to the trial transcript and, in fact, I would

23   offer Exhibit 59 both respect to the gun enhancement and in

24   terms of the objection to weight.

25        I think with --

1          THE COURT:  And I will ask, but I assume both counsel

2     are -- I was the trial judge in this case.  Are both counsel

3     asking me to take judicial notice of the -- of the trial

4     record?

5          MS. FULLERTON:  I am.  The testimony and -- and

6     evidence, Your Honor.

7          THE COURT:  Okay.

8          MR. DAMMAN:  Yes, Your Honor.  We'd also ask that.

9          THE COURT:  All right.  The Court will -- the Court

10    will do so.

11         MS. FULLERTON:  And in terms of evidence on that, the

12    only other evidence I would offer is Exhibit 59 which has those

13    citations.

14         THE COURT:  All right.  Is there any objection to

15    Exhibit No. 59?

16         MR. DAMMAN:  No, Your Honor.

17         THE COURT:  All right.  Exhibit No. 59 will be

18    received.

19         All right.  And I'll hear argument in a moment.

20         Is there any further evidence with respect to this

21    enhancement from the -- from the defense?

22         MR. DAMMAN:  No, Your Honor.

23         THE COURT:  All right.  I'll hear argument of the

24    government at this time.

25         MS. FULLERTON:  Your Honor, I'm aware that the jury

1    found the defendant not guilty on the 924(c) count in terms of

2    possession of a firearm in furtherance of a drug crime;

3    however, what the jury was considering and what this court must

4    consider in terms of the gun enhancement are two different

5    things.

6         And I can see that there may have been concern by one or

7    more jurors that the particular guns found -- nobody linked the

8    particular guns found to any drug dealing activity; however, as

9    set out in Exhibit 59, there was testimony from two different

10   witnesses, Ms. Burke and Ms. Nemeiksis, about the defendant

11   possessing a firearm while he was dealing drugs.

12        Ms. Nemeiksis talked about a time when he delivered drugs

13   to her and he had a gun present in the truck visible to her

14   when he delivered drugs to her.

15        Ms. Burke testified in essence that he carried a handgun

16   on him every day.  He was obtaining drugs every day, he was

17   dealing drugs essentially every day, and he always had a

18   handgun with him and that on at least one occasion, he used

19   that handgun to pistol-whip somebody who hadn't paid him.

20        So I think that evidence meets the preponderance standard

21   necessary to show that it was not clearly improbable that

22   particularly that firearm found in the camper with the larg- --

23   larger quantity of methamphetamine on April 2nd, 2018, was --

24   it was not clearly improbable that that was connected to the

25   drug dealing activity.

```
1          I would remind the Court that on April 18th of 2018, this
2     is filing number 142, the Court overruled the defendant's
3     Rule 29 motion at the end of the government's case which in --
4     is a tacit finding then that the Court found there was
5     sufficient evidence on which a jury could reasonably find the
6     defendant guilty beyond a reasonable doubt of a 924(c) count.
7          The -- the burden here is preponderance of the evidence.
8     And I think we've more than met that standard and, in fact, the
9     Eighth Circuit yesterday put out an unpublished opinion, United
10    States versus Gilberto Ray Ramos, Case Number 17-3680, similar
11    circumstances to this case.  In that particular one, the
12    defendant was convicted of a -- of methamphetamine dealing and
13    he was convicted of felon in possession of a firearm.  That
14    possession of a firearm charge was later vacated and the matter
15    was remanded for resentencing.
16         At that point the court -- the trial court gave the
17    defendant the two-level enhancement and the evidence was
18    similar.  In that case the evidence established that Ramos had
19    received and distributed methamphetamine from his two-bedroom
20    apartment in Springdale, Arkansas, and that officers who
21    searched the apartment which Ramos shared with a woman found a
22    ledger, a digital scale, baggies, cash and methamphetamine in
23    the kitchen and found a .45-caliber pistol under the mattress
24    in one of the bedrooms, the closet for which contained men's
25    and women's clothing.
```

1        In that case, the district judge applied the two-level

2    enhancement and the Eighth Circuit Court of Appeals found that

3    notwithstanding the sentencing court's consideration of

4    acquitted conduct, it was not unreasonable, and the Court did

5    not clearly err in imposing that enhancement.

6        Those facts are very similar to what we have from the

7    April 2nd search where that loaded pistol was found in the

8    camper near where the methamphetamine was found.  And so under

9    all the circumstances, where the gun was found in respect to

10   the methamphetamine, and the fact that we have two witnesses

11   saying that this defendant carried a gun with him, a handgun,

12   when he dealt drugs, I think by the preponderance standard,

13   we've more than met that, and he should get the two-level

14   enhancement.

15            THE COURT:  All right.  Very well.  Thank you,

16   counsel.

17        I'll hear from the defense, please.

18            MR. DAMMAN:  Your Honor, just to pick up where

19   Ms. Fullerton left off in referring to the other case, I don't

20   think at all you can color match cases very easily factually as

21   far as this issue's concerned.  Each case needs to be

22   determined based upon its own facts, and I think the facts in

23   this case were pretty clear that everything in the garage and

24   in the camper was in disarray, there were things everywhere.

25   This is not a gun laying out open next to drugs or

1    paraphernalia or anything like that.  It was actually somewhat

2    difficult for the officers to locate it.

3         So each case has to be determined based upon its own

4    facts, and on these facts, the jury obviously found there was

5    some credibility lacking in -- in the testimony.  I would say

6    probably for sure the testimony of Ms. Burke.  There were

7    numerous inconsistencies in her testimony.  And so I think what

8    happened was the jury found that she was really not credible on

9    her end of it.

10        I understand there's a different burden of proof or level

11   of proof, but I think it's clear that the explanation as to an

12   acquittal has to rely somewhat on her lack of credibility, if

13   not entirely.

14        And so certainly with a lesser standard, the Court could

15   disregard the -- the acquittal, but we do have an acquittal.

16   There's a jury that heard the evidence and said he's not

17   guilty.

18        As far as what the testimony was, Ms. Burke did not say

19   that she, in fact, saw Mr. Mazzulla pistol-whip anyone.  If you

20   look at the precise testimony, it says it appeared as if he did

21   that.  So she -- that's an indication she really didn't see

22   anything that she could testify directly to.  And she made a

23   lot of assumptions and was pretty vague in her testimony.  I'll

24   get into that when we start talking about quantity in some more

25   detail, but I think clearly the jury disregarded her testimony.

1          As far as Ms. Nemeiksis and her testimony that she saw a

2     firearm or handgun on the seat of a vehicle, she may have, but

3     she never saw it in his hand or never saw him ever possess it

4     in a way that would indicate it was connected to drug activity.

5          So I would suggest to the Court that the enhancement

6     doesn't apply.  The acquittal, although not, you know, the be

7     all and end all on that issue, is just one of the factors, and

8     so I'd ask the Court to find that that enhancement does not

9     apply.

10          THE COURT:  All right.  The Court's ready to rule,

11     and I -- and, certainly, the Court does recognize that the

12     acquittal is not equivalent in -- in this case and is not

13     the -- the final answer.  It is persuasive to this Court.  It's

14     not binding to this Court.

15          As -- as both counsel know, I'm aware of the Eighth

16     Circuit cases, not only the one yesterday but the ones

17     previously.  There is a huge battle going on in the -- in

18     the legal world, including up to the Supreme -- to the

19     Supreme Court, a case that will get there, as to whether

20     acquitted conduct could be considered by a judge, whether --

21     whether the trial judge should be an independent finder of

22     fact.  At -- at this point in time in the Eighth Circuit, the

23     trial judge can.

24          I'm choosing not to be in this case.  I respect the -- the

25     jury's verdict.  I am not going to consider the acquitted

1   conduct, number one; but number two, more so the -- the issues

2   that have been brought up, the -- the pistol-whipping, for

3   example, the gun being in possession of Mr. Mazzulla at the

4   time that drug crimes were being committed, the gun that was

5   found on -- on April 2 which was in a chaotic disarray place in

6   the -- in his garage where -- where he was living, the jury had

7   all of that to -- to consider.

8        They obviously did not find beyond a reasonable doubt, but

9   I am finding that it was improbable that the -- that a gun or

10  those guns were connected to drug dealing activity.  Therefore,

11  I will overrule -- I will sustain the objection of the

12  defendant and the enhancement will not apply as to Guideline

13  Section 2D1.1(b)(1).  So that objection is sustained.  As a

14  result of that, paragraphs 71, 75 and 78 in the revised PSR

15  will be adjusted.

16       Okay.  Now, as to the -- the next objection is the

17  obstruction of justice, but let's go to the quantity first.

18  We'll take up the quantity and then come back to the

19  obstruction of justice.

20       All right.  The government's burden and you may proceed.

21            MS. FULLERTON:  Your Honor, I would submit based on

22  the testimony and evidence presented at trial as more outlined

23  in Exhibit 59 which makes references to the citation to the

24  transcript and shows more than sufficient methamphetamine to

25  support the findings made by the probation officer as to the

1    base offense level.

2            THE COURT:  All right.  Very well.  Thank you,

3    counsel.

4        I'll hear from the defense.

5            MR. DAMMAN:  Your Honor, by far the largest quantity

6    attributed to Mr. Mazzulla came from Ms. Burke, and I think

7    there's some important discrepancies to point out with regard

8    to her testimony, and probably one of the more important ones

9    would be her testimony as to Mr. Sisneroz.

10       Her testimony was that she saw Mr. Sisneroz obtain

11   methamphetamine from Mr. Mazzulla at least ten times.  She

12   claimed to have known that, seen it, been personally aware of

13   it, but then not long after she testified to that, Mr. Sisneroz

14   got on the stand and he testified that he bought or obtained

15   methamphetamine from Mr. Mazzulla a total of three times.  One

16   of which was on the occasion in April when Ms. Burke wasn't

17   present and he testified that he was with Travis Hizar at 1421

18   South Folsom.

19       So according to his testimony, there would have only been

20   two occasions at which he would have obtained Mr. -- or

21   methamphetamine from Mr. Mazzulla at which Ms. Burke could have

22   even possibly been present.  And I don't think he even said

23   that she was.

24       But for him to come in and testify and say that it

25   happened basically on two occasions that he obtained

1    methamphetamine from Mr. Mazzulla and for Ms. Burke to testify

2    that she claimed that it was at least ten times, I think that's

3    an indication -- that's just one example of many of her

4    exaggerations.  She exaggerated at least five times what

5    Mr. Sisneroz, who personally was involved in -- according to

6    his testimony in the transaction -- what he said.

7         And so I think that's kind of a benchmark.  And if you

8    review the testimony, I don't think it's unreasonable to say

9    that that's kind of the extent of her exaggeration across the

10   board.  And if the Court agrees with that and significantly

11   reduces her -- the quantity attributable to her testimony, I

12   think that brings the base offense level down to the level 34.

13   It drops it two levels.

14        Beyond that, she claimed that there were -- and this --

15   I'm reading from Exhibit 59, the government's calculation --

16   that over a 16-month period for four weeks, five days a week,

17   she testified that Mr. Mazzulla was going to get at least two

18   pounds from Omaha.  And then their calculation shows 290.5

19   kilograms.

20        Well, if -- if you do the math, that's about 640 pounds.

21   If you go by Cassie Nemeiksis's testimony about what she was

22   paying or did pay Mr. Mazzulla for a quarter ounce or a half

23   ounce, you know, if you're at 480 -- I think her testimony was

24   that it was $480 for a half ounce, that's about $15,000 per

25   pound.  At 290.5 kilograms, that's almost $10 million worth of

1    methamphetamine in about a year's time.  I don't see how that

2    could be credible at all.

3        I don't think there's any credible evidence that

4    Mr. Mazzulla did $10 million worth of methamphetamine business

5    in a little over a year's time.  He's living in a trailer in --

6    in a garage.  And so it's things like that.

7        The exaggerations that -- they don't seem to be much when

8    you hear them in live testimony that, oh, yes, it was every

9    day, two pounds for 16 months.  Well, when you really drill

10   down and get at what the meaning of that is, it just becomes

11   very hard to believe that that would be the quantity, and so --

12   given everything else they claim Mr. Mazzulla was doing in

13   addition to running a tree service.

14       So I would ask the Court to basically disregard

15   Ms. Burke's testimony if not in its entirety as far as

16   quantity, all -- nearly in its entirety.  I know the Court has

17   just said that it respects the jury's verdict, but the jury

18   found the minimum or the amount that it needed to find him

19   guilty.  It didn't specifically find that her testimony was

20   true.

21       So if -- if you analyze it that way, Judge, and I think

22   it's a reasonable analysis, that's -- our objection is then

23   supported.

24           THE COURT:  All right.  Very well.  Anything further

25   from the government?

```
 1              MS. FULLERTON:  No, Your Honor.

 2              THE COURT:  All right.  Let me say this first of all.

 3     Whether this is a level 34 or level 36 makes no difference to

 4     me.  It's just not going to make a difference at -- at

 5     sentencing.

 6          So with that said, what -- what I have to do is to prepare

 7     the calculations to have an appropriate advisory guideline

 8     or -- as a starting point, and I will -- I will do that, but I

 9     want everybody to know it just flat doesn't make a lot of

10     difference to me in this particular case, and -- and we'll

11     discuss that at the -- at the time of sentencing.

12          But with -- with that said, under Guideline Section 2D1.1,

13     that's at page 155 of the -- of the guideline book, if there is

14     at least 15 kilograms but less than 45 kilograms of

15     methamphetamine or at least 1.5 kilograms but less than 4.5

16     kilograms of meth, actual, Mr. Mazzulla falls within a total

17     offense level 36.

18          As I said before, I'm not going to retry this case.  I'm

19     not going to determine who was credible and who isn't.  The

20     jury has already done that.

21          And I will make a finding that the amount of

22     methamphetamine, if it was not 30 kilograms -- and -- and

23     even if I were to disregard substantial portions of Shawndell

24     Burke's testimony, it's still going to be well over 15

25     kilograms but less than 45 kilograms of -- of methamphetamine.
```

1        So for those reasons, I will overrule the defendant's

2   objection as to the content or amount of methamphetamine.  So

3   total offense level 36 will stand as far as the advisory

4   guidelines and the starting point.

5        All right?  Now we're to the objection -- so in case I

6   didn't say it, that objection is overruled so -- all right?

7        Now we're to the last objection and that is the two-level

8   enhancement for obstruction of justice under Guideline Section

9   3C1.1.  The government's burden.

10        MS. FULLERTON:  Yes, Your Honor.  The government

11   would offer Exhibits 60, 61, 62, 63 and 64.  60, 62, 63 and 64

12   are all Saline County Incident Reports from the Saline County

13   Jail.  Exhibit 61 is a U.S. Marshals' report dated April 12th,

14   2018.

15        THE COURT:  All right.  Are there any objections to

16   Exhibits Nos. 60, 61, 62, 63 and 64?

17        MR. DAMMAN:  The only objection I have, Your Honor,

18   is to Exhibit 64 and the reason is that that's a report on an

19   incident dated April 29, 2018.  It's after the jury verdict and

20   I don't believe that conduct occurring after the jury verdict

21   could -- could or should be considered to have obstructed

22   justice.

23        The verdict had been rendered, sentencing may or may

24   not have been an issue, but quantity -- I mean, the quantity

25   was addressed at the trial.  Whether quantity would be a

1    sentencing issue or -- as we can see today or -- we're not

2    retrying that, so I don't know how he could have obstructed

3    after the jury trial so that -- other than that I don't object

4    to the others.

5              THE COURT:  So that was as to Exhibit No. 64?

6              MR. DAMMAN:  Yes, Your Honor.

7              THE COURT:  All right.  No objections having been

8    heard with regard to Exhibits 60, 61, 62 and 63, those four

9    exhibits are received.  The objection as to Exhibit No. 64 is

10   overruled.  Under Guideline Section 3C1.1, what I will be

11   considering is whether the defendant obstructed or attempted to

12   obstruct the administration of justice with regard to either

13   the prosecution or the sentencing in this case and the

14   sentencing is occurring today.

15       So any obstructive behavior, whether it was back in April,

16   at the time of trial or prior to trial or after the trial and

17   before this sentencing, will be considered.  And so Exhibit

18   No. 64 will be received.

19       And as to Exhibits 60, 61, 62, 63 and 64, I will obviously

20   be hearing live testimony also.  I will give them the weight to

21   which they are due after hearing the testimony and the evidence

22   today.  Okay?  So those exhibits are received.

23             MS. FULLERTON:  And the government would call James

24   Sisneroz.

25             THE COURT:  All right.  Mr. Sisneroz then.

1          Counsel, while they're bringing Mr. Sisneroz, I will

2    advise, I do have a sentencing with a TIP interpreter from out

3    of state at eleven o'clock which will probably take about 15

4    minutes or so.  If we are not completed with the testimony,

5    we're going to take a break at 11 for that particular

6    sentencing and then we will continue as long as we need to on

7    this proceeding.

8               MR. DAMMAN:  Okay.

9               THE COURT:  Mr. Sisneroz, if you'll have a seat,

10   please.

11              THE WITNESS:  Yes, sir.

12              THE COURT:  All right.  I believe you've already

13   called the witness, but please call him again and we'll have

14   him sworn.

15              MS. FULLERTON:  The government calls James Sisneroz.

16              THE COURT:  All right.  Mr. Sisneroz, we'll have you

17   sworn in.

18              THE WITNESS:  Okay.

19              COURTROOM DEPUTY:  Please state and spell your name

20   for the record.

21              THE WITNESS:  James Sisneroz.  J-a-m-e-s

22   S-i-s-n-e-r-o-z.

23              COURTROOM DEPUTY:  Please raise your right hand.

24       JAMES SISNEROZ, PLAINTIFF'S WITNESS, SWORN

25              THE COURT:  All right.  Very well.  You may inquire.

1      DIRECT EXAMINATION

2    BY MS. FULLERTON:

3    Q.   Mr. Sisneroz, you testified in the trial of this matter

4    against Mr. Mazzulla; is that right?

5    A.   That's correct.

6    Q.   And on the --  And you testified on April 18th of 2018?

7    A.   Yes.

8    Q.   And when you were -- were you returned then to the Saline

9    County Jail at the end of the court day?

10   A.   I was.

11   Q.   And when you were returned to the Saline County Jail after

12   court on that day, did you have occasion to see Mr. Mazzulla?

13   A.   We did in the booking area.

14   Q.   Okay.  Of the Saline County Jail?

15   A.   At Saline County, yes.

16   Q.   And what happened at that point?

17   A.   I was in a holding tank, and Mr. Mazzulla came in and told

18   the staff that I'd lied in the trial, and then he said that --

19   they dressed him out, and he saw me in the holding tank, and

20   then he asked me, "How does it feel to be a rat now that you're

21   a snitch," and -- and -- and then they removed him out of the

22   area.  They took him to his pod.

23   Q.   Okay.  And were there any other inmates around at this

24   time?

25   A.   It was just me, CO Kalkwarf, and CO Kalkwarf had reported

SISNEROZ - DIRECT                                                    20

1    it to CO Chrans, and Chrans wrote a report, and they gave it to

2    the marshals the next day when we came back.

3    Q.   Okay.  And after that incident on April 18th, did you have

4    additional contacts with Mr. Mazzulla?

5    A.   Yeah, Mr. Mazzulla was in C-pod.  I was in -- or he was in

6    D-pod.  I was in the E-pod.

7            THE COURT:  What dates are we talking?  Is this

8    after --

9            THE WITNESS:  This is Jan- -- this is the -- this

10   would be the 22nd of April, I believe.

11   BY MS. FULLERTON:

12   Q.   A few days after --

13   A.   Afterward.

14   Q.   -- you testified?

15   A.   Yes.

16   Q.   Okay.  So you're still in the Saline County Jail.

17   A.   Yes, still in Saline County Jail.  And there's a -- an

18   inmate had got -- Troy Mason they said got jumped by

19   Mr. Mazzulla and another inmate named Kansas that I know him

20   by, so they pulled him out of the cell.

21       Our cell -- our pod has a big window, and he walked by it,

22   and he said that -- I was in the window, and he said that,

23   "We're going to jump you, we're going to get you too."

24   Q.   And who is -- who is -- you said he'd said this --

25   A.   Rodney Mazzulla walked by the window and said that he was

1    going to jump me, that he would get me when he walked past the

2    window when the sheriffs took him out --

3    Q.   Okay.

4    A.   -- because they -- they had just got done jumping Troy

5    Mason.

6    Q.   All right.  And Troy Mason is another inmate at Saline

7    County?

8    A.   Yes.

9    Q.   Okay.  Did you have any other incidents with Mr. Mazzulla

10   since April 22nd or thereabouts?

11   A.   Just recently Rodney Mazzulla came back from CCA.  They --

12   He was in the booking area.  They were booking him back in.

13            THE COURT:  Again, when you say "recently", what

14   date are we talk- -- are we talking the last week or what?

15            THE WITNESS:  It was --  He came back two weeks ago,

16   I believe.  And they were moving -- we were -- we were in the

17   rec area, our pod, and we came out to go back to our pod.  We

18   have to pass through booking.  Rodney was in booking.  CO

19   Johnson had told me that Rodney could be up there and don't say

20   anything.  I said okay.

21        So we came through and he was up there getting booked back

22   in from CCA.  He's like -- he turned and looked at me and said,

23   "Hey, you bitch snitch," and CO Fakar (phonetic) came out from

24   behind the desk and then escorted him into a holding cell, that

25   way we could pass -- I could pass by so that way he wouldn't

1    try to do anything to me.

2    BY MS. FULLERTON:

3    Q.    Okay.  Any other encounters with Mr. Mazzulla?

4    A.    Just this morning.  I mean --

5    Q.    What happened this morning?

6    A.    He came -- he was in the window, and he was like, so

7    how's -- he said, "This is where you hold the rats."  He said,

8    "That guy's a snitch right there."  Just calling me out as --

9    because I testified on him.

10   Q.    And this was at Saline County?

11   A.    And this was at Saline County this morning.

12   Q.    Okay.  You see Mr. Mazzulla in the courtroom?

13   A.    I do.

14   Q.    Could you point to him and describe what he's wearing.

15   A.    He's wearing orange.  He's right there (indicating).

16   Q.    Sitting at the defense table?

17   A.    Sitting next to his attorney.

18          MS. FULLERTON:  I'd ask the record reflect the

19   witness has identified the defendant.

20          THE COURT:  The record will so reflect.

21          MS. FULLERTON:  No further questions.

22          THE COURT:  All right.  Cross-exam.

23                      CROSS-EXAMINATION

24   BY MR. DAMMAN:

25   Q.    Mr. Sisneroz, as to this April 18th incident that you

1    testified to, you said it was in a holding tank; is that right?

2    A.   What's that?

3    Q.   You said it was in a holding tank --

4    A.   I was --

5    Q.   -- that this occurred?

6    A.   I was in a holding tank.

7    Q.   Okay.  So what's a holding tank?  Is it a small cell with

8    a door with a window in it?

9    A.   Yeah.

10   Q.   Okay.  So you were locked in by yourself in a room and

11   there was just a window there, correct?

12   A.   Yeah.

13   Q.   Okay.  So none of this interaction that you testified

14   about in that incident was personally face-to-face.  It would

15   have been through that window; would that be correct?

16   A.   Well, the door -- the door was cracked open.  They didn't

17   shut it, but, I mean, yeah, I was still behind a window.

18   Q.   Okay.  And how far away was Mr. Mazzulla from you?

19   A.   We were, like, five feet away.

20   Q.   And did he have a corrections officer near him?

21   A.   Yeah, because he was just getting dressed out.

22   Q.   Okay.  Did you have a corrections officer near you?

23   A.   He was like -- he would have been in between us basically.

24   Q.   Okay.  So this would have been with a corrections officer

25   but --

1    A.    Yeah.

2    Q.    -- standing between the two of you?

3    A.    Yeah.

4    Q.    And were there other corrections officers in the area?

5    A.    Kalkwarf was the only one there at this time.

6    Q.    Any other inmates in that area?

7    A.    I don't believe so.

8    Q.    So can you estimate the entire period of time this

9    incident would have lasted in seconds or minutes?

10   A.    Seconds.

11   Q.    Okay.  Then you testified to another incident I think you

12   said April 22nd; is that correct?

13   A.    I'm not sure of the exact date, but somewhere around

14   there, yeah.  It wasn't long after the trial.

15   Q.    Do you know if there was a report prepared of that

16   incident?

17   A.    I -- I had -- my attorney has two reports on it so...

18             MR. DAMMAN:  Your Honor, could I approach the

19   witness?

20             THE COURT:  You may.

21   BY MR. DAMMAN:

22   Q.    Mr. Sisneroz, I just handed you Exhibit 64.  I'd ask you

23   to take a look at that exhibit and just, first of all, let me

24   know does that appear to you to be the same document that you

25   just testified to that you believe your attorney had provided

1   to you?

2   A.   If you're asking me -- I've -- I've never actually saw the

3   incident report so...

4   Q.   But you've read Exhibit 64 or at least you started to read

5   it, correct?

6   A.   Yeah, I haven't completed finished reading it --

7   Q.   Okay.

8   A.   -- but you want me to read it all?

9   Q.   Well, just for now can you tell me from what you've read

10  does Exhibit 64 appear to you to be documentation about --

11  A.   Yes.

12  Q.   -- what you testified to?

13  A.   Yes.

14  Q.   Okay.  And I think you said in your direct examination

15  that -- and maybe it was Ms. Fullerton who said this -- that it

16  was April 22nd?

17  A.   I'm not for sure of the correct date.

18  Q.   Okay.  So it may have been on the -- whatever date's --

19  A.   The 29th.

20  Q.   The 29th.

21  A.   Yeah.

22  Q.   Of April.

23  A.   Because I had a kite that was faxed to the U.S. Marshals

24  about it also.

25  Q.   So you haven't had a chance to review Exhibit 64 to see

 1    whether it fairly and accurately represents what happened with

 2    that --

 3    A.   This is the first time I've seen it --

 4    Q.   Okay.

 5    A.   -- so...

 6    Q.   Would you finish reviewing it --

 7    A.   Okay.

 8    Q.   -- and then let us know.

 9    A.   (Witness reviewing the document.)  Yeah, this is --

10    Q.   So after having reviewed --

11         THE COURT:  Mr. Sisneroz, what I want you to testify

12    to is what you know and what you remember.  I don't care what

13    somebody else wrote.

14         THE WITNESS:  Okay.

15         THE COURT:  Counsel can ask you about that in just a

16    moment, but I want you to testify to what you know and what you

17    remember.

18         You may proceed -- just a moment.  You may proceed,

19    counsel.

20    BY MR. DAMMAN:

21    Q.   Mr. Sisneroz, you testified that on this April 29th

22    incident at the Saline County Jail, there were some words back

23    and forth about jumping someone.

24    A.   Where it says that he passed the E-pod, which I wasn't --

25    that's where I was, in E-pod.  It said that he was -- that I

1   testified to where he was calling us snitches, and that's when

2   he'd yelled out that he was going to jump me too.

3   Q.   When you were -- when this happened, was there glass

4   between you --

5   A.   Yeah.

6   Q.   -- as there was in the first incident?

7   A.   Yes.

8   Q.   Okay.  And in the Saline County Jail, is it true that

9   inmates will receive write-ups if they misbehave?

10   A.   Yeah.

11   Q.   And that's all documented?

12   A.   Mm-hmm.

13   Q.   Yes?

14        And, for example, a threat or an assault would result in a

15   write-up at the Saline County Jail, wouldn't it?

16   A.   Yeah, for the most part.  It just depends.  Because I

17   asked if they were going to write a report on when he came from

18   CCA the time that -- just recently when I was in booking, and

19   they said that they weren't going to because they were in the

20   wrong because they weren't -- they weren't supposed to be

21   moving us anyways when somebody was out in the booking area, so

22   I know a report didn't get written up then.

23   Q.   You also testified to some interactions with Mr. Mazzulla

24   after court.  Did that occur in this building?

25   A.   That was back when we went to -- in Saline County in the

1    booking area.

2    Q.   Okay.  And when you say "booking area", was it the same as

3    that first incident about --

4    A.   Yes.

5    Q.   -- with you in a holding cell?

6    A.   Yes.

7    Q.   Were you in the -- in there with the door closed?

8    A.   The door was cracked open, but, I mean, I was still behind

9    the -- inside a room, the...

10   Q.   And --

11   A.   But they were dressing us out, and when they dress us out,

12   they usually leave the doors cracked open so the next person

13   can go in.

14   Q.   So were there --  Were there multiple corrections officers

15   on that occasion?

16   A.   There was only one that I know.  That was Kalkwarf.

17   Q.   Did you yell back any profanities or anything?

18   A.   No.

19   Q.   Then you testified -- well, let me clarify it.  Is that

20   what you testified to about the two weeks ago incident?

21   A.   Yeah.

22   Q.   Okay.  And Mr. Mazzulla used the word snitch?  He

23   called -- basically, he called you a snitch, correct?

24   A.   Right, a rat, snitch.

25   Q.   That's pretty common, isn't it, among the inmates at

1    Saline County Jail to talk about snitches and refer to other

2    people as snitches, isn't it?

3    A.   It just depends on who you're with or where you're around.

4    Q.   It's not the first time you've heard that, is it?

5    A.   No.

6              MR. DAMMAN:  Your Honor, could I have just a moment

7    to look at an exhibit?

8              THE COURT:  You may.

9    BY MR. DAMMAN:

10   Q.   On the April 18th, 2018, incident --

11             THE COURT:  Are we talking July 18 or April 29?

12             MR. DAMMAN:  April --  What did I say?

13             THE COURT:  You said April 18.  Are you talking about

14   April 29?

15             MR. DAMMAN:  Well, I believe there was testimony to

16   an April 18th incident during --

17             THE COURT:  Oh, okay.

18             MR. DAMMAN:  -- during the trial.

19             THE COURT:  Very well.  You may proceed.

20   BY MR. DAMMAN:

21   Q.   Have you seen the report from that incident?

22   A.   I haven't seen it, but my attorney has it, he said.

23   Q.   Okay.  You're aware, aren't you, that in that report it

24   says that you yelled back at Mr. Mazzulla and exchanged -- the

25   two of you exchanged profanities towards each other?  Isn't

1    that what happened?

2    A.   I may have.  I'm not for sure.  But -- but I was told not

3    to say anything and -- you know, so I just remember not saying

4    much at all.

5    Q.   So your earlier testimony that you didn't say anything,

6    that really wasn't true.  You may have and...

7    A.   You know what, it was -- what was said in that -- that I

8    had lied in -- in testimony.  I told him that, "I didn't lie

9    about shit."  But the -- the exchanging the words, that's what

10   was -- the exchanging the words, that were never -- not that --

11   because he was threatening me.

12       I had told him that I didn't lie when I was -- when --

13   because he said that I lied in trial, and I said, "I didn't lie

14   about shit when I was on the stand."

15   Q.   So it was an angry exchange about whether you lied or not?

16   A.   Yeah, it could be, yeah.

17   Q.   Okay.

18            MR. DAMMAN:  No further questions.

19            THE COURT:  Very well.  Anything further from the

20   government?

21            MS. FULLERTON:  Just real briefly, Your Honor.

22                      REDIRECT EXAMINATION

23   BY MS. FULLERTON:

24   Q.   Mr. Sisneroz, as a person who's incarcerated, does it

25   concern you if you get labeled as a snitch?

1    A.    Yeah.

2    Q.    And why?

3    A.    Just because -- I mean, there are people who have ties --

4    people who know people, you know.  And, you know, it's -- it

5    can be an ugly game.  You know, it can be ugly.

6    Q.    Okay.

7    A.    It can be dirty so...

8    Q.    Does it cause you to fear potentially for your safety in

9    the future?

10   A.    Yeah, it does.  I mean, I'm -- now that, like,

11   potentially I'm labeled as a rat or a snitch or whatever, you

12   know.

13   Q.    And when Mr. Mazzulla said he was going to jump on you,

14   what did you understand him to mean?

15   A.    That him or his people -- you know, they would get word to

16   somebody that, you know, knows somebody that they know and

17   eventually that they would attack me or -- possibly there or in

18   prison, because all they have to do is send an email from

19   prison to prison, and they can get word that somebody told, and

20   I could potentially get stabbed.

21            MS. FULLERTON:  All right.  No further questions.

22            THE COURT:  All right.  Very well.  May this witness

23   be excused?

24            MS. FULLERTON:  Yes, Your Honor.

25            THE COURT:  All right.  You may step down.

1       I'll ask the marshal are these two individuals and the

2    other individuals testifying today, are they separated?

3            DEPUTY MARSHAL:  Yes, Judge.

4            THE COURT:  Okay.  Very well.  Keep -- make sure that

5    that -- that continues.

6       Okay.  Thank you.  You may step down.

7       It's about five minutes until 11.  We have to get the TIP

8    interpreter on the -- on the line.

9       Mr. Molsen, we're going to take up the eleven o'clock

10   sentencing right at 11.  We're going to take a brief recess and

11   we will reconvene.  If counsel would be ready -- we should be

12   ready at about 15 minutes after 11.

13      All right.  But for this proceeding, we stand in recess at

14   this time.  Thank you.

15      (Recess taken at 10:55 a.m.)

16      (At 11:17 a.m. on August 1, 2018; with counsel and the

17   defendant present:)

18           THE COURT:  All right.  We're back on the record in

19   United States of America versus Rodney Mazzulla.  I think we

20   had just broke with the first witness.

21      The government may call its next witness.

22           MS. FULLERTON:  Your Honor, the government calls

23   Shawndell Burke.  I've asked the marshals to bring her in.

24           THE COURT:  All right.  Very well.  You may do so.

25      All right, Miss Burke, if you'd take a seat at the witness

 1    stand, I'll have you sworn in, but first let's recall the

 2    witness, if you would.

 3            MS. FULLERTON:  The government calls Shawndell Burke.

 4            THE COURT:  All right.  Miss Burke, we'll have you

 5    sworn in at this time.

 6            COURTROOM DEPUTY:  Please state and spell your name

 7    for the record.

 8            THE WITNESS:  Shawndell Burke.  S-h-a-w-n-d-e-l-l,

 9    and Burke, B-u-r-k-e.

10            COURTROOM DEPUTY:  Please raise your right hand.

11            SHAWNDELL BURKE, PLAINTIFF'S WITNESS, SWORN

12            THE COURT:  All right.  You may proceed, counsel.

13            MS. FULLERTON:  Yes.

14                            DIRECT EXAMINATION

15    BY MS. FULLERTON:

16    Q.   Ms. Burke, back in November of 2017, were you in the

17    Saline County Jail?

18    A.   Yes, I was.

19    Q.   And were you waiting ultimately to testify in this case?

20    A.   Yes, I was.

21    Q.   And at that time was Rodney Mazzulla also in the Saline

22    County Jail?

23    A.   Yes, he was.

24    Q.   And in about the middle of November, was there an incident

25    in which Mr. Mazzulla made some statements to you?

1    A.    Yes, there was.

2    Q.    And could you tell the Court what happened.

3    A.    I was coming down the hallway and he was in his pod, I

4    believe it was E-pod.  He was slamming up against the door with

5    papers in his hand calling me a snitch, calling me a bitch,

6    slamming these papers up against the paper -- or up -- up

7    against the door screaming at me, had other people in the pod

8    hollering at me also, and then proceeded -- the -- to go down

9    the hallway with the COs, and there was other people all the

10   way down the hallway hollering at me that he had calling me the

11   same -- the same names.

12   Q.    That Rodney had been calling you?

13   A.    Yeah.

14   Q.    Okay.  And did that cause you concern?

15   A.    Yeah, it did.

16   Q.    And why did it cause you concern?

17   A.    Because I'm going to be housed in prison, and I've got

18   to -- I've got to -- I don't know what -- you know, I don't

19   know what's going to happen to me because of the concern of

20   the -- him carrying these papers and what he's telling people

21   for my safety.

22   Q.    You say "papers".  Do you know what -- what -- what do you

23   mean by "papers"?

24   A.    The paperwork concerning our -- our case.

25   Q.    Did he have reports about what you had said about him?

BURKE - DIRECT                                                35

1   A.   Yes.

2   Q.   Like your proffer interview report?

3   A.   Yes.  And he's showing everybody in the jail, and what

4   they're telling other people, and it's my safety that's at

5   stake.

6   Q.   Okay.  And did you report that to the jail officials?

7   A.   Yes, I did and also to a sheriff.

8   Q.   To a sheriff's deputy?

9   A.   Yes.

10  Q.   All right.  And did you stay then at Saline County until

11  the trial in April?

12  A.   No.  They moved me to CCA.

13  Q.   All right.  Did you have any issues while you were at CCA?

14  A.   No, I didn't, but on the way back, they put us together on

15  the van.

16  Q.   Okay.  So you were in Saline County for a while?

17  A.   Yes.

18  Q.   All right.  When did you go to CCA?

19  A.   April -- in April.

20  Q.   Was it after the trial?

21  A.   Oh, my goodness.  I'm not sure what date the trial was.

22  Q.   Okay.  Were you in Saline -- were you in CCA for a while

23  and then brought back to Saline for the trial?

24  A.   Yes.

25  Q.   Okay.  So you left Saline, went to CCA and then came back

BURKE - DIRECT                                                        36

1    to Saline; is that right?

2    A.   Yes.

3    Q.   And were you in Saline County for at least a couple of

4    weeks maybe before the trial?

5    A.   Yes.

6    Q.   Okay.  And was that when they put you in the -- the van

7    with -- with Rodney to come back to Saline County?

8    A.   Yeah, from CCA.

9    Q.   Okay.  And what happened at that time?

10             THE COURT:  And what day is this?  A couple weeks

11   prior to the April 16 trial?

12             THE WITNESS:  No.  This -- this was just --

13   BY MS. FULLERTON:

14   Q.   This is right before coming back for the sentencing

15   hearing?

16   A.   Yeah, for this hearing --

17   Q.   Okay.

18   A.   -- yeah.

19   Q.   So let's -- let's go back then.  You -- you had this

20   incident with Rodney in November at Saline County?

21   A.   Yes.

22   Q.   Did you go to CCA between that incident and the trial?

23   A.   I went to CCA -- I'm not sure on the dates.  I'm not

24   sure --  What date was the trial?

25   Q.   If I told you it was in mid April.

1    A.    Okay.  I -- I was in CCA prior to -- because of the

2    incident that happened at -- at Saline County --

3    Q.    Mm-hmm.

4    A.    -- they took me to CCA and then brought me back --

5    Q.    Okay.  So --

6    A.    -- for the trial.

7    Q.    So at some point you went down to CCA, but you came back

8    to Saline County before the trial; is that fair?

9    A.    Yes.

10   Q.    Okay.  And when you came back to Saline County, what, a

11   week or so before the trial?

12   A.    Yes.

13   Q.    All right.

14   A.    Yes.

15   Q.    Was Rodney also in Saline County?

16   A.    Yes.

17   Q.    Did you have -- did he -- did you have any interaction

18   with him at Saline County before the trial?

19   A.    No.  The incident was -- was before -- was before.

20   Q.    Okay.  All right.  So then the trial happens.  You

21   testified, right?

22   A.    Yes.

23   Q.    And then you went back to CCA?

24   A.    Yes.

25   Q.    And then a couple of weeks ago did you come back to Saline

1    County from CCA?

2    A.   Yes.

3    Q.   And was that to testify at this hearing?

4    A.   Yes.

5    Q.   And were you put in a van with some other inmates?

6    A.   Yes, I was.

7    Q.   Was Rodney Mazzulla one of those inmates?

8    A.   Yes, he was.

9    Q.   Was Michelle Schwab one of those inmates?

10   A.   Yes, she was.

11   Q.   Okay.  Was there anybody else?

12   A.   Another gentleman, the name of Phil.  I'm not quite sure

13   of the last name.

14   Q.   Did you know him from before at all?

15   A.   I knew him from Grand Island, Nebraska.

16   Q.   Okay.  So there's four of you in the van?

17   A.   Yes.

18   Q.   And --

19   A.   And two CO's, two --

20   Q.   Two guards?

21   A.   Two guards.

22   Q.   All right.  And so CCA is outside of Kansas City?

23   A.   Yes.

24   Q.   Okay.  So when you're placed in the van then to come back

25   to Saline County, what happened?

1    A.   Well, it started -- Michelle and I were loaded first and

2    then the two gentlemen were loaded after us.  He got in the van

3    and said, "Hello, ladies."

4    Q.   Is this Rodney we're talking about?

5    A.   Yes, it is.

6    Q.   All right.

7    A.   And then he said -- I don't know, am I allowed to say

8    what...

9    Q.   Did he call you some names?

10   A.   Yes, he called us some names.

11   Q.   Okay.  What kind of names did he call you?

12   A.   He called us fucking bitches.  And then it was -- the trip

13   was a five-hour trip.  It was a bad trip.  I mean, which we

14   knew it was going to be.  I mean, anybody put in that situation

15   that you testify against -- riding in a trip with people that

16   you testify against is going to be an uneasy trip.

17   Q.   What happened?

18   A.   We talked about the case, about charges being -- he wanted

19   us to drop -- drop our charges.

20   Q.   When you say "us", who are you talking about?

21   A.   Michelle and I.

22   Q.   Okay.  What did Rodney say to you and Michelle about --

23   about dropping charges?

24   A.   He wanted us to drop our weight charges.

25   Q.   Did he want you to change your testimony?

BURKE - DIRECT                                                      40

1    A.    Yes, he did.

2    Q.    Did he tell you to call your lawyer and recant your

3    testimony?

4    A.    Yes, he did.

5    Q.    Did you tell him you would do that?

6    A.    I did.

7    Q.    Why did you do that?

8    A.    I was scared.  I was scared.

9    Q.    Why were you scared?

10   A.    I felt bad.  I was just --  By the time we got to Saline

11   County, I was ready to call my lawyer.  I was -- I -- I told

12   him I would.  I just -- I was scared.

13   Q.    Okay.

14   A.    I was scared.

15   Q.    Did he threaten you during that trip?

16   A.    I don't know.  I was just scared.  I was -- I was scared

17   enough to want to call my lawyer and change my whole testimony.

18   Q.    Okay.  Did he talk about a trip to Mexico?

19   A.    Yes, he did.

20   Q.    What did he say about that?

21   A.    He said that we were going to have a trip to Mexico to get

22   married, and he said, "Now if we ever get a trip to Mexico," he

23   said, "I'm going to drown you."

24   Q.    All right.  And did you believe he would do that?

25   A.    Yes, I do.

1    Q.    Okay.  And was that why you were frightened?

2    A.    Yes.

3    Q.    Okay.  Now, when -- in terms of changing your testimony,

4    was your testimony at trial truthful?

5    A.    Yes, it was.

6    Q.    Okay.  Do you -- did you intend to change your testimony?

7    A.    No, I didn't, but I was -- I was shook up enough to where

8    I just wanted to be done with it.

9    Q.    Okay.  You didn't want him threatening you anymore?

10   A.    No.

11   Q.    And do you continue to be afraid of Mr. Mazzulla?

12   A.    Yes.

13             MS. FULLERTON:  I have no further questions.

14             THE COURT:  Very well.  Cross-examination.

15                        CROSS-EXAMINATION

16   BY MR. DAMMAN:

17   Q.    Ms. Burke, with regard to the November incident in the

18   Saline County Jail, Mr. Mazzulla was not able to come

19   personally up to you and talk to you, correct, because he was

20   in another room behind a window; is that right?

21   A.    Yes, he was.

22   Q.    Okay.  And there were a large number of guards and other

23   inmates in that area; is that correct?

24   A.    There was one, one guard.

25   Q.    And as far as other people saying that you were a snitch,

1   were there other people in that area against whom you

2   proffered?

3   A.   No.

4   Q.   Okay.  And that's really the extent of it on that occasion

5   was that he yelled at you that you were a snitch and that --

6   and your -- your impression was that he was encouraging others

7   to call you a snitch; is that correct?

8   A.   He was.  It was very bad.  I do believe that the guard

9   also filled out a statement on behalf of me.

10  Q.   Well, when you say "it was very bad," what you mean is

11  there was just a lot of people yelling at you that you were a

12  snitch; is that right?

13  A.   Yeah, he had the whole pod roused up.

14  Q.   Okay.  But he never threatened you in any way with any

15  harm or anything.

16  A.   He's -- he's very -- very evil with what he does.  I mean,

17  and it's every time to where I can't walk down the hallway to

18  go to the nurse's office, to go to the library, to go to law

19  library, anything.  I can't go down there because the guards

20  don't want to take me down that hallway because how rowdy that

21  he gets.

22  Q.   Well, he yells at you that you're a snitch.

23  A.   Yeah.  I shouldn't have to have that.

24  Q.   Okay.  Well --

25  A.   And he's got the paperwork in his hand --

1   Q.   But --

2   A.   -- and he's got other people doing the same things.

3   Q.   But what my question is, is whether he has ever

4   verbally -- or at least in November of 2017 whether he verbally

5   made any threat of harm to you?

6   A.   No.

7   Q.   Okay.  So then you testified about a trip from CCA --

8   A.   Mm-hmm.

9   Q.   -- and that was just a couple of weeks ago, correct?

10  A.   Yes.

11  Q.   Okay.  But you and Mr. Mazzulla were both at CCA for many

12  weeks and months --

13  A.   Mm-hmm.

14  Q.   -- prior to that, correct?

15  A.   Mm-hmm.

16          THE COURT:  You have to say "yes" or "no", ma'am.

17  A.   Yes, sir.

18          THE COURT:  Okay.

19  BY MR. DAMMAN:

20  Q.   And isn't it true that at CCA there is a way that you

21  could, and you did, pound on a door or a window or something to

22  try to get Mr. Mazzulla's attention?

23  A.   Yes.

24  Q.   You would do that about every day, wouldn't you?

25  A.   Yes.

BURKE - CROSS                                                    44

1   Q.   Okay.  And, in fact, could you see him through that window

2   when you would --

3   A.   Yes.

4   Q.   -- pound?

5   A.   Yes, I could.

6   Q.   Okay.  He didn't come over.  You were pounding on it to

7   initiate something with him, correct?

8   A.   Well, yes, sir.  But it wasn't necessarily every day that

9   it was me.  There were other girls that were doing it too at

10  the window, two other people.

11  Q.   But you did it a lot.

12  A.   There was -- there was other girls that were doing it to

13  people out there in the pod.  That's a very big pod that he is

14  in.  It was one of the biggest pods at CCA that he is in.

15  Q.   Well, I understand that may be true --

16  A.   Okay.

17  Q.   -- but I'm just -- I'm asking you whether you did that on

18  many occasions.

19  A.   Yes, I did do it.

20  Q.   Okay.  More than ten times?

21  A.   On occasions I did it, yes.

22  Q.   Okay.  And I'm just talking, like, ten different days, for

23  example, at least that you --

24  A.   At least.

25  Q.   Okay.

1    A.    I never threatened him though.

2    Q.    Well, but you were trying to communicate with him,

3    correct?

4    A.    Yes.

5    Q.    Okay.  And then did you make some hand signals to him on

6    occasion?

7    A.    I'd wave at him.

8    Q.    Okay.  Did you ever make the shape of a heart with your

9    fingers?

10   A.    No.

11   Q.    When you would wave at him, were you waving at him to come

12   over so you could talk to him?

13   A.    No.

14   Q.    What was the purpose of pounding on the window and waving

15   at him?

16   A.    Wave at him.

17   Q.    Okay.  Well, you -- because you wanted to be friendly

18   towards him?

19   A.    I had no bad -- I had no bad thing to say.  I wasn't

20   threatening him.  And like I said, there were other girls also

21   that were -- that were waving at their friends also and talking

22   to people out there.

23   Q.    So despite this incident in November of 2017 when he

24   yelled at you that you were a snitch and other people did too,

25   you were still wanting to have some sort of contact or

1    back-and-forth with him in a positive way; is that right?

2    A.   I was -- yes.

3    Q.   Was Michelle Schwab also in CCA with you?

4    A.   Yes, she was.

5    Q.   And was she housed in such a way that you and Michelle had

6    regular daily contact?

7    A.   Yes.

8    Q.   And did there come a time when you would have Michelle

9    wake you up so that you could go and try to get Rodney's

10   attention out on the yard or in the prison in some way?

11   A.   The person whose room that we were -- that we'd knock on

12   the window, the person that he ran with was a friend of mine's.

13   The person that he ran with -- that he would run with out on

14   the yard.

15   Q.   That Rodney would?

16   A.   Yes, was my roommate's friend.

17   Q.   Okay.

18   A.   So when -- the -- regards to knocking on the window to get

19   his attention wasn't necessarily for me knocking on the window

20   to get his attention.  So this is getting -- it's getting me

21   confused with my roommate.  So it's not all in regards to him.

22   Q.   The van ride from CCA was in a van with cages or

23   partitions in it; is that correct?

24   A.   Yes.

25   Q.   So when you were seated in that van, would there have been

1   a cage between you and Mr. Mazzulla or a partition?

2   A.    Yes.

3   Q.    Were you seated one seat in front of or behind him or

4   could you characterize the seating arrangements?

5   A.    We were sitting in front and he was sitting in the back.

6   Q.    Was he in the seat directly behind you?

7   A.    No.  Right next -- right -- right next -- right --

8   Q.    To the side?

9   A.    To the side of me.

10  Q.    One seat back and over to the side?

11  A.    Just to the side of me.

12  Q.    Okay.  So there was a partition down the middle?

13  A.    No.  No.  It's just a square.  It's -- it -- you got a

14  seat like this (indicating) and then a square (indicating) with

15  seats on it.  So he was sitting right here (indicating) and you

16  got the square seat right here (indicating).

17  Q.    Well, let me ask it this way:  How many feet away from him

18  were you?

19  A.    Probably two feet.

20  Q.    Okay.  And were there other people seated next to you and

21  to Rodney?

22  A.    Michelle was sitting next to me and Phil was sitting next

23  to him.

24  Q.    Was this conversation from Leavenworth to Lincoln a

25  conversation among all of you?

1    A.    No.   It was mainly between him.

2    Q.    But Ms. Schwab and Phil would have heard the conversation?

3    A.    Yes, and the guards heard it also.

4    Q.    Did you ever say during the trip that you were feeling

5    uncomfortable, to report that --

6    A.    It was a very uncomfortable drive.

7    Q.    Well, but I'm -- I'm asking did you report that to

8    anybody?

9    A.    The guards -- the guards up front knew.   And, yes, I made

10   a statement to the guards that it was -- that -- when we got

11   out of there that -- and they made a report of it.

12   Q.    Were you laughing and joking at some point during the trip

13   with Mr. Mazzulla?

14   A.    There was -- it wasn't a laugh.   It was a very

15   uncomfortable ride.   It was probably the worst five hours I

16   had.

17   Q.    And so you -- did you discuss various things that you

18   testified to at Mr. Mazzulla's trial?

19   A.    We discussed a lot of things.

20   Q.    Okay.

21   A.    We discussed whatever Rodney wanted to discuss.

22   Q.    Did you discuss whether or not Mr. Mazzulla knew Michael

23   Dryden?

24   A.    Yes, we did.

25   Q.    And the truth of that is Mr. Mazzulla doesn't know Michael

BURKE - REDIRECT                                                    49

1    Dryden and never has met him.

2              MS. FULLERTON:  I'm going to object on relevance,

3    Your Honor.

4              THE COURT:  Yeah.  Sustained.  We're not going to

5    retry the case.  Sustained.

6    BY MR. DAMMAN:

7    Q.   You mentioned that this bothered you.  You know that

8    Mr. Mazzulla is -- has never assaulted Rhonda, his wife, don't

9    you?  He's never struck her.

10             MS. FULLERTON:  Objection, relevance.

11             THE COURT:  Overruled.  I don't know whether she

12   knows or not.  Overruled.

13        You can answer if you know.

14        You may answer if -- if you -- if you know.

15             THE WITNESS:  Yeah, he has.

16        (An off-the-record discussion was had between the

17   defendant and Mr. Damman.)

18             THE COURT:  Any further questions?

19             MR. DAMMAN:  No, Your Honor.

20             THE COURT:  Any redirect?

21             MS. FULLERTON:  Yes, just briefly, Your Honor.

22                       REDIRECT EXAMINATION

23   BY MS. FULLERTON:

24   Q.   Ms. Burke, when you were coming back to CCA -- or, I'm

25   sorry, coming back to Wilber from CCA in the van, where was

1    Mr. Mazzulla seated with respect to Michelle?

2    A.   He was right directly behind her.

3    Q.   Okay.  And despite this cage or whatever you called it,

4    was he able to physically contact Michelle?

5    A.   Yes, he was.

6    Q.   What did you see him doing with respect to Michelle?

7    A.   He pulled her hair.

8    Q.   Okay.  So he was able to touch her?

9    A.   Yes, he was.

10   Q.   And was he making similar comments to Michelle to the ones

11   he was making to you?

12   A.   Yes, he was.

13            MS. FULLERTON:  No further questions.

14            THE COURT:  Very well.  May this witness be excused?

15            MS. FULLERTON:  Yes, Your Honor.

16            THE COURT:  Just a moment.  May this witness --

17            MR. DAMMAN:  Can I just ask a couple follow-up

18   questions on that?

19            THE COURT:  If it's in relation to the redirect and

20   that's it.

21            MR. DAMMAN:  Well, it's on the hair-pulling thing.

22            THE COURT:  Brief.

23                         RECROSS EXAMINATION

24   BY MR. DAMMAN:

25   Q.   Ms. Burke, the -- the hair pulling with Ms. Schwab, that

```
 1   wasn't a thing done in anger, was it?
 2   A.   No.  He was -- he pulled her hair.  He -- I don't know
 3   what the comment was that he made, but he reached up and pulled
 4   her hair.
 5   Q.   It was done playfully.
 6   A.   Yeah.  She didn't like it.  She didn't like it at all.  It
 7   was uncalled for.
 8             MR. DAMMAN:  No further questions.
 9             THE COURT:  Very well.  May this witness be excused?
10             MS. FULLERTON:  Yes, Your Honor.
11             MR. DAMMAN:  Yes, Your Honor.
12             THE COURT:  You may step down and you are excused,
13   Miss Burke, thank you.
14             THE WITNESS:  Thank you.
15             THE COURT:  The government may call its next witness.
16             MS. FULLERTON:  The government would call Michelle
17   Schwab.
18             THE COURT:  Marshal, Michelle Schwab.
19        Ms. Schwab, if you would please take a seat at the stand.
20        Counsel, I'll have you recall the witness.
21             MS. FULLERTON:  The government calls Michelle Schwab.
22             THE COURT:  Okay.  Ms. Schwab, I'm going to have you
23   sworn in in just a moment.
24             COURTROOM DEPUTY:  Please state and spell your name
25   for the record.
```

1              THE WITNESS:  My name's Michelle Schwab.

2     M-i-c-h-e-l-l-e S-c-h-w-a-b.

3              COURTROOM DEPUTY:  Please raise your right hand.

4          MICHELLE SCHWAB, PLAINTIFF'S WITNESS, SWORN

5              THE COURT:  You may proceed, counsel.

6                       DIRECT EXAMINATION

7     BY MS. FULLERTON:

8     Q.    Ms. Schwab, did you testify against Mr. Mazzulla at trial?

9     A.    Yes, I did.

10    Q.    And prior to the trial in April of 2018, were you in the

11    Saline County Jail waiting to testify?

12    A.    Yes.

13    Q.    And was Rodney Mazzulla also there?

14    A.    Yes.

15    Q.    And did you see him from time to time?

16    A.    Yes.

17    Q.    And prior to trial did he say or do anything that

18    indicated to you that he knew you were going to testify against

19    him?

20    A.    Yes.

21    Q.    What was that?

22    A.    He's on the other side of the glass, but he came by our

23    pod, and -- and my hands are down, but said, "Are you

24    testifying against me?"

25    Q.    Okay.

SCHWAB - DIRECT                                                        53

1    A.    Yes.

2    Q.    Was --  Did that happen more than once?

3    A.    A few times.  You know, he'd just shake his head and, you

4    know.

5    Q.    And look at you?

6    A.    Yeah.

7    Q.    All right.  And so you testified against him at trial?

8    A.    I did.

9    Q.    And then did you go to CCA for a while?

10   A.    Yes.

11   Q.    And were you brought back to Wilber to testify at this

12   hearing?

13   A.    Yes.

14   Q.    And when did you come back from CCA to Wilber?

15   A.    The best of my recollection, it was the 14th of July.

16   Q.    Okay.  And were you in a van?

17   A.    Yes.

18   Q.    And who else was in the van?

19   A.    Shawndell Burke, Rodney Mazzulla and some other gentleman

20   named Phil.

21   Q.    Okay.  And were there a couple of guards?

22   A.    The guards in the front, yeah.

23   Q.    Okay.  So the four of you were in this van riding back to

24   Wilber from CCA?

25   A.    Correct.

SCHWAB - DIRECT                                                        54

1    Q.   During that trip, did Mr. Mazzulla make any comments to

2    you?

3    A.   Yes.

4    Q.   What kind of comments did he make?

5    A.   Just that we were bitches and that we had lied and that we

6    should tell the truth and that I should show him my boobs.

7    Q.   Okay.  And did this happen once or was this an ongoing

8    thing during the trip?

9    A.   It was a long ride, yeah.

10   Q.   He continued to do this?

11   A.   Yeah.  Yes.

12   Q.   And did he want you to change your testimony from trial?

13   A.   Yes.

14   Q.   Did he want you to call somebody and tell them that you

15   wanted to recant your testimony?

16   A.   Yes.

17   Q.   What did you tell him?

18   A.   That I had told the truth.

19   Q.   Okay.  Did you hear his comments to Shawndell Burke?

20   A.   Yes.

21   Q.   What kind of comments did he make to her?

22   A.   The same kind of comments.

23   Q.   All right.

24   A.   That and then at a few more, like, sexually suggestive

25   comments toward her.

SCHWAB - DIRECT                                                55

1   Q.   All right.  Of a -- those comments, were they in your

2   understanding him wanting to have a relationship with her or

3   were they negative type comments?

4   A.   Negative.

5   Q.   Okay.  He was saying dirty things to her?

6   A.   Yeah.

7   Q.   All right.  Was he also wanting her to change her

8   testimony?

9   A.   Absolutely.

10  Q.   And did that happen numerous times?

11  A.   Yes.

12  Q.   Was this a comfortable trip?

13  A.   Not at all.

14  Q.   All right.  And at some point did he physically touch you?

15  A.   He pulled my hair.

16  Q.   Okay.  Why -- do you know why that happened?

17  A.   No.  Just we were in close proximity.

18  Q.   Was he sitting behind --

19  A.   Yes.

20  Q.   -- directly behind you?

21  A.   Yes.

22  Q.   And he was able to reach your hair through the cage?

23  A.   Yes.

24  Q.   All right.  After he pulled your hair, did he say anything

25  else to you about you testifying?

SCHWAB - CROSS                                                    56

1    A.   Just again that the least I could do for him is to show

2    him my boobs.

3              MS. FULLERTON:  Okay.  No further questions.

4              THE COURT:  All right.  Very well.  Cross-exam.

5                         CROSS-EXAMINATION

6    BY MR. DAMMAN:

7    Q.   Ms. Schwab, Mr. Mazzulla didn't say change your testimony.

8    He said you need to tell the truth.  Isn't that what he was

9    telling you?

10   A.   Yes.  But I had told the truth so...

11   Q.   Well, but his words to you were not "change your

12   testimony".  His --  The general gist of the conversation was

13   that he felt you hadn't and he wanted you to tell the truth; is

14   that correct?

15   A.   Right.  He wanted me to give his version.

16   Q.   Well, whatever the version of the truth is, in his mind he

17   believed you hadn't told the truth, correct?

18   A.   Correct.

19   Q.   Okay.  And so he didn't come to you on the van and say

20   change your testimony and lie.  He's -- he's wanting you to

21   tell what he believes the truth.

22   A.   Correct.

23   Q.   Okay.  And you -- you know Mr. Mazzulla well, don't you?

24   A.   No.

25   Q.   Well, you know him well enough to know that he -- he has

1    some firmly held opinions --

2    A.    Okay.

3    Q.    -- perhaps about his case?

4    A.    Sure, yes, absolutely.

5    Q.    Okay.  So, basically, you had a conversation about various

6    things that occurred during his trial that he believed people

7    had lied about; is that right?

8    A.    Right.

9    Q.    Okay.  For example, with you he felt that your testimony

10   was not truthful because you had said you had received

11   methamphetamine from him, but his position was that you never

12   personally in a hand-to-hand transaction got it?

13   A.    That's -- that's what he said.

14   Q.    That's his problem with your testimony.

15   A.    Correct.

16   Q.    Okay.  And he wants you to clarify it that way and to tell

17   the truth that in his opinion it never happened hand to hand,

18   the drug transaction?

19   A.    That's his opinion, correct.

20   Q.    Okay.  And as far as Ms. Burke is concerned, you heard the

21   conversation between Mr. Mazzulla and Ms. Burke, correct?

22   A.    I did.

23   Q.    And it was the same thing, wasn't it?  That he had certain

24   things that he felt she had not been truthful about and he

25   wanted her to tell the truth; is that right?

SCHWAB - CROSS                                                    58

1    A.    Right.  He wanted her to tell his version of the truth.

2    Q.    Right.

3    A.    Correct.

4    Q.    And as far as the hair thing, he really didn't pull your

5    hair.  He was just kind of twirling it with his finger, wasn't

6    he?  I mean, it wasn't done in anger, correct?

7    A.    No, I don't think he was trying to be malicious.  I think

8    he was just trying to send a message that, you know, he was

9    close.

10   Q.    And the general conversation about the testimony at trial

11   from you and Ms. Burke was generally in a friendly manner,

12   wasn't it?  It wasn't full of anger.

13   A.    I guess it's not as angry as he can be.

14   Q.    Okay.  Well, other people were in the van during this

15   conversation, correct?

16   A.    Yes.

17   Q.    Did a guard ever say, hey, stop yelling or stop arguing or

18   being aggressive or anything like that?

19   A.    No.  They didn't say anything even from the beginning when

20   he called us bitches.

21   Q.    So if it was getting to be an aggressive and

22   out-of-control type of conversation, they would have heard it

23   and brought it to an end, wouldn't they?

24             MS. FULLERTON:  Objection, speculation.

25             THE COURT:  Sustained.

1   BY MR. DAMMAN:

2   Q.   Did you ever tell either of the guards on the trip there

3   that -- during the conversation or at any time that you wanted

4   to stop, you didn't want him talking to you anymore,

5   Mr. Mazzulla?

6   A.   No.

7   Q.   As far as Saline County's concerned, while you were there,

8   there was never any kind of threat or anything of that sort

9   made by Mr. Mazzulla towards you; is that correct?

10  A.   We aren't really able to speak face-to-face at -- at

11  Saline County.  It's only through the glass or, like, through

12  the vents or the walls.

13  Q.   And on the trip in the van that you just testified to,

14  Mr. Mazzulla never verbally threatened harm to you in any way;

15  is that correct?

16  A.   No.  He never made any --

17  Q.   He never said --

18  A.   -- direct threat.

19  Q.   -- you testified against me so I'm going to do something

20  to you.  He never did anything to that effect, right?

21  A.   No, nothing specific, no.

22  Q.   And he didn't say anything of that sort to Ms. Burke

23  either, correct?

24  A.   No.  I think the only comment that he had made to her was

25  that if things would be different, they would have been going

1   to Mexico to get married.  As it stands, if he got her in

2   Mexico, he would drown her.

3   Q.   And he said that in a joking kind of way.

4   A.   Yeah.  I understand that he feels some animosity.  We're

5   witnesses in a testimony -- or in a trial or whatever, but we

6   never should have been together.  It was miserable.

7   Q.   Pardon me?

8   A.   I said we never should have been in the same van.  It was

9   miserable.

10  Q.   Okay.  Was there ever laughing involved back and forth

11  during these conversations about the trial?

12  A.   Yeah.  Yeah, there was some funny things said.

13  Q.   Did you laugh at the comment about if we'd have been

14  married and gone to Mexico but under the circumstances I'd

15  drown you?  Did you laugh at that comment?

16  A.   Yeah.

17  Q.   Did Ms. Burke laugh at it too?

18  A.   Yeah, I think Shawndell did.

19          MR. DAMMAN:  No further questions, Your Honor.

20          THE COURT:  Any redirect?

21                       REDIRECT EXAMINATION

22  BY MS. FULLERTON:

23  Q.   Ms. Schwab, you said that the trip was miserable.  Could

24  you tell the Court why it was miserable.

25  A.   It's just uncomfortable and -- and, like, we were

SCHWAB - REDIRECT                                             61

1   witnesses in his trial, and him trying to change our -- make us

2   change our testimony or make me feel like I did something wrong

3   was miserable, and it's a three-and-a-half-hour trip.

4   Q.   And it was continuous?

5   A.   Yeah.  Yeah.  It was -- and it's just an uncomfortable

6   situation to -- to be in.

7             MS. FULLERTON:  No further questions.

8             THE COURT:  Any further questions?

9             MR. DAMMAN:  No.

10            THE COURT:  And from the government, I apologize that

11  you were in the same van.

12            THE WITNESS:  Thank you.  I appreciate that.

13            THE COURT:  We'll see if that can get corrected in

14  the -- in the future regardless of what testimony is so...

15            THE WITNESS:  Thank you.

16            THE COURT:  May this witness be excused?

17            MS. FULLERTON:  Yes, Your Honor.

18            MR. DAMMAN:  Yes, Your Honor.

19            THE COURT:  You may step down.  Thank you.

20            THE WITNESS:  Thank you.

21            THE COURT:  The government may call its next witness.

22            MS. FULLERTON:  The government rests on that issue,

23  Your Honor.

24            THE COURT:  Very well.  Defense, any testimony or

25  evidence?

1          MR. DAMMAN:  We'd call Rodney Mazzulla.

2          THE COURT:  All right.  Mr. Mazzulla, come forward.

3     All right.  Mr. Mazzulla has been called.

4     We'll place you under oath, sir.

5          COURTROOM DEPUTY:  Please state and spell your name

6     for the record.

7          THE WITNESS:  Rodney P. Mazzulla.  R-o-d-n-e-y P.

8     M-a-z-z-u-l-l-a.

9          COURTROOM DEPUTY:  Please raise your right hand.

10               RODNEY MAZZULLA, DEFENDANT, SWORN

11         THE COURT:  You may proceed, counsel.

12         MR. DAMMAN:  Thank you.

13                      DIRECT EXAMINATION

14    BY MR. DAMMAN:

15    Q.   Mr. Mazzulla, you're the defendant in this case, correct?

16    A.   That's correct.

17    Q.   And you were present in the courtroom for the testimony of

18    James Sisneroz, Shawndell Burke and Michelle Schwab just now?

19    A.   I was.

20    Q.   And with regard to Mr. Sisneroz, he testified to some

21    interactions with you at the Saline County Jail.  He testified

22    as to one that occurred in a holding tank April 18th.

23         Could you describe for the Court what happened on that

24    occasion.

25    A.   Yes, sir.  I believe the 18th was after the trial.  We was

MAZZULLA - DIRECT                                                    63

1   returned back to the jail.  Sisneroz was held in the holding

2   cell.  He'd already been dressed out, I believe.  They took him

3   in first anyway.

4            THE COURT:  Mr. Mazzulla, why don't you face me and

5   the court reporter so we can hear you.

6            THE WITNESS:  Okay.  Sorry.

7   A.   So -- so I come in second.  They dressed me out, and when

8   I come out of the dressing room -- his cell was directly across

9   from the -- the doorway where I come out of, and I said, "How

10  does it feel to be a rat," and he said, "Fuck you," and that

11  was the end of it.  The guard had shoved me down the hall and

12  put me in my jail cell.

13  BY MR. DAMMAN:

14  Q.   Then did you hear Mr. Sisneroz testify to an incident that

15  was first characterized as having occurred April 22nd, but then

16  after some more testimony, it appears as if maybe it was

17  April 29th of 2018 at the Saline County Jail?

18  A.   Yes.

19  Q.   Okay.  And what happened on that occasion?

20  A.   We had a confrontation in my cellblock and -- with Troy

21  Mason.  Nobody jumped him.  He just wanted to be moved out of

22  that cell.  And the next day -- I believe it was the next

23  day -- I was walking down past Sisneroz' cell, which is

24  right -- right beside my cellblock, and I called him a snitch.

25           And, again, we're being transported up and down the

MAZZULLA - DIRECT                                                64

1    hallway with a guard usually holding on to your arm, and so you

2    get about one or two words off before they snatch you down the

3    hall further and tell you to shut up.  And I called him a

4    snitch and he yelled something back.

5         There's a couple other people in there that I don't get

6    along with and they all flipped me off and that was the extent

7    of it.

8              THE WITNESS:  Sorry.  I'm not looking at you.

9    BY MR. DAMMAN:

10   Q.   Then he also testified to an incident about two weeks ago

11   in booking and -- and that -- in his testimony on that

12   incident, he said that you -- that you were in a holding cell,

13   and you said something to the effect of "this is where they

14   hold rats".

15        Is that --  Do you recall that testimony by Mr. Sisneroz?

16   A.   Yes.  That was this morning, I believe.  That was this

17   morning.

18   Q.   Well, describe what happened.

19   A.   When I come -- they brung me out of my cell and -- to

20   prepare me to come to the hearing this morning, the sentencing

21   hearing here, and, apparently, they'd had him out first.  I

22   didn't know he was in there.

23        And when they brought me out, they handcuffed me and

24   shackled me up and walked me down the hall to go outside, and I

25   looked in the cell and there Sisneroz was.  And there's a guard

 1    standing right there so that I couldn't talk to him, but I

 2    said, "Oh, this must be where you hold the rats," and that was

 3    the extent of that.

 4    Q.   Okay.  Now, with regard to Mr. Sisneroz, have you ever

 5    made any verbal threats of harm to him?

 6    A.   No.

 7    Q.   Have you ever directed anyone else to make any verbal

 8    threats of harm to him?

 9    A.   No.

10    Q.   Have you had a lot of generally friendly conversations

11    with him in the Saline County Jail?

12    A.   Prior to his testimony, yes, we used to eat bagels

13    together and play chess together.  He acted as he was my

14    friend, yes.

15    Q.   Shawndell Burke testified about an incident November of

16    2017 in the Saline County Jail, said something about you

17    holding a paper up against a window.

18         What happened with that incident?

19    A.   During the whole time we've been in the Saline County

20    Jail, up to this point, I wasn't aware that Shawndell was

21    proffering against me.  We were held in the same cellblocks

22    adjacent to each other and we could look in the window and see

23    reflections of each other.

24         And so I would say once a week she would show me her tits

25    in the reflection.  She always give me heart I love you signs,

1    stuff of this nature.

2        And then I got diagnosed with high blood pressure, and

3    they moved me from that cellblock to E wing where they could

4    monitor me on the cameras better, and then shortly after that I

5    got a copy of the proffered statement -- I keep wanting to look

6    at you but -- I got a copy of the proffered statement.

7        And so then the next time -- they take Shawndell down to

8    the nurse's station about twice a day.  And so the next time I

9    seen her walk down the hallway, I yelled at her through the

10   door and said, "You are a snitch and child molester," and that

11   was the extent of that.

12   Q.   She then testified to the trip here from CCA in

13   Leavenworth in a van with other persons.  First let's start

14   with -- can you describe the van and who made the trip with

15   you.

16   A.   Yes.  Michelle Schwab and Shawndell Burke was in the front

17   part of the van.  There's a partition.  It's a corrugated metal

18   partition with holes in it so you can see through it and then

19   conversate through it.

20       I was in the back of the van with a Phillip Smith I think

21   is his last name.  I don't know him.  I just learned that since

22   the -- I've been in jail on the return trip here.

23       And there was two guards in the front.  I believe they had

24   video.  I'm not certain if they have recording or not.

25   Q.   So as the trip progressed, did the conversation among

1    those in the van turn to your trial?

2    A.    Absolutely, yes.

3    Q.    And were you the one who brought up that subject?

4    A.    Absolutely.

5    Q.    What was your intent in bringing that up?

6    A.    Well, it started immediately as soon as I entered the van.

7    I said, "Hello, ladies," probably in a sarcastic manner, I

8    imagine.  Either way you can take it.  And I did call them a

9    bitch.

10   Q.    So --

11   A.    And -- go ahead.

12   Q.    Well, just to put this into context, after your trial, did

13   you believe that numerous witnesses had lied in your case?

14   A.    Absolutely.  Every one of them did.

15   Q.    And did that bother you?

16   A.    Yes.

17   Q.    Did you want to solve that issue in some way?

18   A.    I told -- I told Shawndell and I told Michelle -- more so

19   Michelle because she did less lying than Shawndell did, but --

20   but I told them -- I said, "You know, I get it.  I understand.

21   I understand what you did.  You know, you come clean, you take

22   your plea bargain.  You take responsibility for your actions,

23   you get a small sentence and you go home."

24         I said but to get up on the stand and to lie against

25   somebody just trying to testify for theirself or trying to

 1    stand up for their rights, and you get up there and lie, I

 2    said, that's a whole different scenario, that's a whole

 3    different game, you know.  I said, "Just tell the truth.

 4    That's all I'm asking you to do.  Just tell the truth."

 5        I told Shawndell, I said, "Nobody in their right mind's

 6    going to sell two pounds of dope every day for months."  And

 7    she said, "I didn't say that, I didn't say that," and I said,

 8    "Yes, you did."  Well, in the long run, she says, "Well, I'm

 9    going to call my attorney and tell him that I didn't mean to

10    say it that way."

11        And Michelle -- as far as Michelle goes, she testified

12    that -- that I sold her a half a ounce of dope and she sold me

13    an eight-ball.  And I said, "Well, you got part of it right.

14    You did sell me an eight-ball, but I never sold you a half."

15        "Yes, you did.  Yes, you did."

16        I said, "No, I never."

17        So she explained the situation to me.  She said that she

18    come to my house with Johnny, which is the guy that lived in my

19    garage, and Johnny went in the garage and come out with dope,

20    and so she assumed it come from me.

21        I said, "Well, that's not what you said on the stand.  You

22    said you bought it from me."  And she said, "I see your point."

23    However, she said she'd never change her testimony, that she's

24    standing on that, that she would never change it because she

25    wants her deal.

1    Q.   When you used various words to -- in questioning about

2    what they said at trial, did you ever directly tell them to

3    change their testimony or did you say "tell the truth"?

4    A.   I said, "Tell the truth."  I never told them what to

5    change.  I never told them amounts to change or any scenarios

6    like that.  I said, "All I'm asking is just tell the truth."

7    "You tell the truth and I'll deal with the rest," is what I

8    told them.

9    Q.   Did you ever make any threat of harm to anyone in the --

10   during that van ride?

11   A.   Absolutely not.  Like I said, I know we was under video.

12   I don't know if we're being recorded.  I made jokes all the way

13   up here.  "Turn the recording up, please."  Because Shawndell

14   was admitting to lies all the way up here, and I would jokingly

15   say, "Turn the recording up so we can get this all on tape,"

16   and everybody would laugh.

17        It wasn't a stressful situation.  It was a jokingly

18   situation.  I told them both I understood their position.  You

19   know, all I wanted them to do was tell the truth, you know.  I

20   mean, anybody in their right mind knows I haven't sold

21   $10 million worth of dope.

22   Q.   With the conversation about the trip to Mexico and so

23   forth where you said that you would -- if you did go, you would

24   drown Shawndell, describe that conversation.

25   A.   I told Shawndell -- Shawndell's always kind of liked me,

```
 1    apparently.  She beats on the windows, gives me heart signs.

 2    She shows me her titties, she says that she loves me --

 3              MS. FULLERTON:  Objection, nonresponsive.

 4    A.    -- every time that she gets the chance.  Excuse me?

 5              THE COURT:  Just a moment.

 6              THE WITNESS:  I'm explaining --

 7              THE COURT:  Just a moment.  The objection is

 8    sustained.

 9         Just answer the question that he has.

10         Ask the question.

11    A.    I forgot the question.

12    BY MR. DAMMAN:

13    Q.    Well, the -- the contact -- the question was on the --

14    the -- the conversation about the trip to Mexico.  What --

15    what -- what was said?

16    A.    I told her, I said, "You know, Shawndell, we could have

17    ran off to Mexico together."  And then I said, "But now if we

18    run off to Mexico, I'm going to drown you."  We all laughed.

19    It was a joke.  It wasn't a threat.  It was a joke.  And we

20    laughed and we joked about it.

21    Q.    And --

22    A.    I mean --

23              THE COURT:  I -- I've got the answer.

24    A.    Yeah, that's it.

25    BY MR. DAMMAN:
```

1    Q.   And as far as your time with Ms. Burke in -- when you were

2    both in CCA and Leavenworth, did she appear to want to have

3    contact or conversations or some interactions with you while

4    you were there?

5    A.   Absolutely.

6    Q.   Okay.  And in what way?

7    A.   Every time she gets a chance.  We see each other, she's in

8    medical, I'll go by the windows, she beats on the windows,

9    gives me the heart.  That's the way they do down there, the

10   girls give you the heart sign.  It means I love you.

11        Even --  She beats on the window when I run.  I run every

12   day out on the track.  They can look out their windows.  They

13   beat on the windows.  They were joking about coming up here.

14        Michelle Schwab -- because Shawndell works nights down

15   there.  She's got some job, I'm not aware of what she does, but

16   she got some job, and she would have Shawn- -- Michelle come

17   down and wake her up every day so that she could look out the

18   window at me running.  Because they were talking about how good

19   of shape I was in, more than everybody else out there and all,

20   and we was all laughing and joking about that.

21        Since we've been up here, Shawndell goes to the nurse's

22   station every day for her medication or something, whatever she

23   does, and she says I love you through the window every time she

24   walks by me, every time.  I don't yell back at her anymore and

25   I'm done with all that, you know.  It's just -- it just irks

MAZZULLA - DIRECT                                                72

1    me.

2    Q.   Is there anything else about the testimony of these three

3    witnesses today that you would like the Court to know as far as

4    it bears on the -- your alleged obstruction of justice?

5    A.   Well, it -- you know, I haven't taken the stand.  I was

6    advised not to take the stand.

7            MS. FULLERTON:  I'm going to object, Your Honor.

8    We're not going to refight this war.

9            THE COURT:  Yeah.  The objection is sustained.

10           THE WITNESS:  Absolutely.  You wouldn't want the

11   truth to come out, would we?  That would be --

12           THE COURT:  You can ask the question.

13           MR. DAMMAN:  Well, Judge, I -- I guess the question

14   was limited to what these three witnesses said today --

15           THE COURT:  I understand that.

16           MR. DAMMAN:  -- on this obstruction issue.

17   BY MR. DAMMAN:

18   Q.   And so if we limit it to that, Mr. Mazzulla, is there

19   anything else you want the Court to know?

20   A.   Well, you know, they're saying that I threatened them and

21   tried to get them to change their story.  I just asked them to

22   tell the truth.  Michael Dryden, Shawndell doesn't know him, I

23   don't know him.

24           MS. FULLERTON:  Objection, Your Honor.

25           THE COURT:  Sustained.

 1            MR. DAMMAN:  No further questions.

 2            THE COURT:  Cross-examination.

 3            MS. FULLERTON:  No.

 4            THE COURT:  All right.  You may step down,

 5     Mr. Mazzulla.

 6            THE WITNESS:  Absolutely not.  I wouldn't -- I

 7     wouldn't cross me either.

 8            MR. DAMMAN:  No further evidence, Your Honor.

 9            THE COURT:  Very well.  I'll hear argument.

10            MS. FULLERTON:  Your Honor, I think the evidence more

11     than supports a finding that the defendant obstructed justice.

12            THE COURT:  I'll --

13            MR. DAMMAN:  Well, Your Honor, I think we see a man

14     who's passionate about his case, he feels strongly about it.

15     We all express ourselves in different ways when we have those

16     sorts of feelings and you've seen what kind of way that

17     Mr. Mazzulla -- he's a direct person.  He says what's on his

18     mind and there's a difference between saying what's on your

19     mind and what you believe to have been the truth and

20     threatening someone.

21         And intent comes into play here, I think.  Beyond that,

22     you know, there -- the reality is that he didn't -- nobody ever

23     came in and said he threatened harm to me.  I guess the closest

24     we could get to that would be maybe Mr. Sisneroz when he said

25     the thing about getting jumped, but even that is -- under the

1    circumstances were -- it would be hard-pressed, I think, to see

2    that as some sort of imminent direct threat.

3         But it's just really unfortunate that all these folks

4    have -- had to have so much interaction, not only at trial --

5    during the months and weeks leading up to the trial, during the

6    trial, after the trial.

7         It just seems that --

8              THE COURT:  I agree with you there.

9              MR. DAMMAN:  -- these instances have been created --

10   or these interactions have been allowed to occur and they never

11   should have.

12        And I don't know that we should be that surprised that

13   some of these things were said because this is kind of the way

14   the game's played in the Saline County Jail and at CCA and

15   everywhere, that people accuse each other of being snitches,

16   and they do it in a different way, and I don't think it came as

17   a surprise to Ms. Schwab or Ms. Burke or Mr. Sisneroz or -- and

18   I'm -- I'm sure Mr. Mazzulla's not the only one who's ever said

19   that to them.

20        So I -- I -- I just think that it's not the type of

21   behavior that really the guidelines intended to cover as far as

22   intent and threat and so forth, so I'd ask the Court to sustain

23   the objection.

24              THE COURT:  All right.  Very well.  The Court's ready

25   to -- to rule.  If I were teaching the guideline application on

1    3C1.1, this would be the archetypical example of what that

2    guideline is intended to -- to cover.  This case --  This

3    enhancement isn't even close.  The objection is going to be

4    overruled.

5         Mr. Mazzulla, you did yourself no good by objecting,

6    nitpicking on this enhancement.  Fortunately for you, I will be

7    sentencing you on the totality of the record and not on any

8    portion of -- of this enhancement.  This was an ill-advised

9    display to have the witnesses come in the courtroom today, but

10   it is what it is.  And I'm not being critical of Mr. Damman.

11   He needs to do what he -- what he needs to do.

12        But for the record, the objection will be overruled.  My

13   finding is as follows:

14        James Sisneroz' testimony I find to be credible.

15   Mr. Sisneroz on three occasions -- the first one was on

16   April 18 of 2018, the day that he testified in this court, came

17   back, was confronted by the defendant who told him that he

18   lied, that he's now a snitch, that he's a rat.

19        After that, on April 29th of 2018, I don't know whether

20   Troy Mason got jumped or not, and it doesn't make any

21   difference to me.  What does make a difference is that this

22   defendant told Mr. Sisneroz that we're going to jump you

23   and get you too.  A direct threat that is believed by this

24   court.

25        Then two weeks ago on July 18th of 2018, Sisneroz comes

1    back from CCA, once again he's confronted by the defendant.

2    Hey, bitch, snitch.  If those aren't considered to be threats,

3    I don't know what they are.

4        Then this morning, the day of the testimony, today, the

5    defendant confronts Sisneroz and says this is where -- this is

6    where rats are held.  The guy's a snitch.

7        Shawndell Burke testifies, and my concern is her

8    testimony in particular on the van ride up here, and god knows

9    why any of these individuals were in the same van with

10   Mr. Mazzulla, but, anyway, Mr. Mazzulla -- at that time her

11   testimony was that -- and actually the defendant confirmed

12   that -- he gets in, greets them with a "hello, ladies", calls

13   them bitches or whatever name -- there were three different

14   descriptions of what he called them, but they all agreed it

15   was -- it was negative.

16       The defendant wanted them to in his view -- I mean, he's

17   saying tell the truth, tell his version of the truth.  Wanted

18   the weights to be different than what they'd testified to,

19   wanted Miss Schwab to testify in a -- in another way.

20       Now, I understand what the defendant is saying, that I

21   didn't give direct hand-to-hand methamphetamine exchange.

22   That's not what the law is and that doesn't make any

23   difference.  There's no question what he was wanting Michelle

24   Schwab to do.

25       Then Michelle Schwab testifies again about the van ride,

1    described it, July 14 of 2018.  Gets in the van, calls them

2    bitches, you lied, tell the truth, show me your boobs, all of

3    those things as -- as the van ride initiates.

4        Miss Schwab testified that she wanted him to change her --

5    she wanted -- he wanted her to change the testimony at least

6    to, in her words in quotes, his version of the truth.  She

7    testified that she did tell the truth at -- at trial.  I find

8    her testimony to be credible.

9        I'm not putting any stock on the pulling the hair and the

10   drowning in Mexico comments.  That doesn't make any difference

11   to me.  I'm -- I'm relying upon the other comments that I'm

12   relying to specifically.

13       So long story short, the objection to 3C1.1, obstruction

14   of justice, is overruled and the two-point enhancement will

15   apply.

16       Okay.  I believe I've ruled on all of the objections.

17       I will say this before we go to sentence.  Even if I were

18   to sustain each one of the defendant's objections and the

19   defendant's total offense level of 34 and the criminal history

20   category is VI, that leads to a guideline sentencing range of

21   262 to 327 months.

22       Now, I want everybody to know that I will be imposing the

23   sentence that I impose pursuant to the Section 3553(a) factors

24   and the totalities of the circumstances that I heard at trial

25   and observed in the presentence report, at least those that are

1    not objected to.

2         And I am calculating the guidelines because I have to.

3    All right?  I'm calculating the guidelines to have an

4    appropriate advisory guideline starting point, but I want to be

5    clear, I would be imposing the same sentence today regardless

6    of the rulings I just made on the guideline enhancements.  I

7    made the rulings because I have to, and they'll be a starting

8    point, but I'd be imposing the same sentence regardless of any

9    of those rulings.

10        So, in other words, whether there's a total offense level

11   of 34 with a criminal history category VI or whether it's an

12   offense level of 36 or 38, frankly makes no difference to me.

13   All right?

14        So with that -- with that said, I take it both parties

15   would like me to adopt the remainder of the PSR that either has

16   not been objected to or has been ruled upon?

17             MS. FULLERTON:  Yes, Your Honor.

18             MR. DAMMAN:  Yes, Your Honor.

19             THE COURT:  All right.  I will do so.

20        Have each of you received the Sentencing Recommendation

21   dated July 23 of 2018?

22             MS. FULLERTON:  Yes, Your Honor.

23             MR. DAMMAN:  Yes, Your Honor.

24             THE COURT:  All right.  Let me go over the guideline

25   calculations with you, Mr. Mazzulla.  With my rulings, the

```
 1    total offense level is now 38 and the criminal history category

 2    is VI.  The guideline custody range for Counts I and V is 360

 3    months to life and for Count II is 360 to 480 months.

 4         The guideline provision for supervised release for Count I

 5    is five years, and for Count II it's four to five years,

 6    Count V it's five years.

 7         You're not eligible for probation.

 8         The fine range is 50,000 to $10 million on all counts and

 9    there'll be a special assessment of $100 assessed on each count

10    for a total assessment -- special assessment of $300.

11         Have I accurately stated the sentencing guidelines given

12    my rulings?

13              MS. FULLERTON:  Yes, Your Honor.

14              MR. DAMMAN:  Yes, Your Honor.

15              THE COURT:  All right.  Very well.  Are both of you

16    now prepared to proceed to sentencing?

17              MS. FULLERTON:  Yes, Your Honor.

18              MR. DAMMAN:  Yes, Your Honor.

19              THE COURT:  I'll hear from the government first.

20              MS. FULLERTON:  Your Honor, based on all the

21    evidence, including the testimony presented today, I would ask

22    the Court to sentence the defendant to 30 years.

23              THE COURT:  Very well.  Thank you, counsel.

24         I'll hear from you.

25              MR. DAMMAN:  Yes, Your Honor.
```

1          I -- Your Honor, I'd like the Court to pay particular

2     attention to two of the 3553(a) factors.  And first of all,

3     3553(a)(2)(C), which is the need for the sentence to protect

4     the public from further crimes and -- of the defendant.

5          Mr. Mazzulla's 58 years old.  If you were to sentence him

6     to 30 years in prison, he would be basically in his mid 80s,

7     around 80, I suppose, when he would be released.  I don't think

8     we need to protect the public from an 80-year-old man.  I -- I

9     doubt that the Court's ever had an 80 or even a

10    70-some-year-old man before it on a -- on any kind of similar

11    offense.  I don't think --

12          THE COURT:  Yeah, actually, I have.

13          MR. DAMMAN:  Well, I would say it's probably rare,

14    though.  I think this is a 20- to 30-year-old man's game but --

15          THE COURT:  I wish it were.

16          MR. DAMMAN:  Well, I -- I guess I -- I don't pretend

17    to know every single case you've had, Your Honor, but I'm just

18    suggesting that it --

19          THE COURT:  I understand.

20          MR. DAMMAN:  -- it may or -- it may be significantly

21    longer than what we need to protect the public from

22    Mr. Mazzulla.  Even if it would be a 15- to 20-year sentence,

23    we're looking at somebody who'd be in their mid 70s, so I -- I

24    would, of course, ask the Court to consider that.

25          And then 3553(a)(6) addresses the need to avoid

 1     unwanted -- or sentencing disparities, unwarranted sentencing

 2     disparities.  And I realize that that deals with similarly

 3     situated defendants when you start to color match and compare

 4     cases.

 5         However, I think there's precedent for not foreclosing a

 6     sentence adjustment based upon that subsection even when

 7     someone doesn't cooperate and you're comparing him to others

 8     who did.  And in *U.S. v. Amaya*, 949 F.Supp.2d 895, it's an Iowa

 9     case from 2013, defendant -- the guidelines suggested or

10     advised 360 months.  Defendant was sentenced to 180 months, and

11     the reason was that when the Court -- even though the defendant

12     hadn't cooperated and the co-defendants had, the Court found

13     that due to the significant differences in the sentences

14     compared to the co-defendant that it was warranted to impose a

15     lesser sentence, and so I think we have a similar situation.

16         We have other co-defendants that I think the --

17     Mr. Sisneroz had about a 19-year sentence, Ms. Burke 14 years,

18     Ms. Schwab 10 years, Ms. Nemeiksis 5 years, 10 months; but they

19     all cooperated.  And so I think it's reasonable to expect that,

20     especially given the fact they testified, they're probably

21     looking at single digits in years compared to what -- it would

22     be a 30-year sentence.  That's quite a difference among the

23     people involved in this.

24         So I would ask the Court to consider all -- not only those

25     two factors but all of them and a sentence of significantly

1    less than the 360 months.

2           THE COURT:  All right.  Very well.  Thank you,

3    counsel.

4       Mr. Mazzulla, at this time you do not have to speak, you

5    don't have to say anything if you wish, but now is the time for

6    you to address me if you wish to say something before I

7    pronounce sentence.

8           THE DEFENDANT:  Your Honor, I want to apologize for

9    my anger.  I do have a issue with my anger when I feel like

10   I've been cheated and lied about and I feel that's what's

11   happened here.

12      I wanted to take the stand and testify, if you remember,

13   during trial.  I spoke to you briefly about that and you told

14   me to speak with my attorney.  I was convinced not to take the

15   stand.  I don't know whether it was bad or -- or good that I

16   didn't.

17      I do know this, that people lied and there's no way that

18   I -- I could confront them lies without taking the stand.  I

19   tried to do that here.  I understand we're not retrying the

20   case here.

21      But it just seems like to me without me saying something,

22   well, then people like Michael Dryden, that I've never even

23   knew before, got up on the stand and said bad things about me,

24   said that I had dope deals with him.  I don't even know him,

25   never seen him before until April 22nd when we was in the same

1    jail cell in Lincoln is the first time I ever seen the man.

2         When I walked in that courtroom, I didn't even know -- I

3    didn't even know who he was then until I seen him again, and I

4    said, "Oh, yeah, there's that guy.  I remember him from jail."

5    I don't know him from the streets.  I never met him at

6    Shawndell's house.  I never met him up in Omaha.  It didn't

7    happen.  Absolutely did not happen.

8         If you read the -- and I'm going to be quick about this.

9    I'm not going to get into it, but if you read the proffered

10   statements that each and every one of them give, they

11   counterdict [*sic*] theirself and they tell the truth.

12        And you can see where Joe Burns was supposed to have -- he

13   proffered on me too, but he didn't show up for court.  He put

14   hundreds of pounds on me too.  He didn't show up for court so

15   they didn't use his testimony because Shawndell Burke told the

16   prosecutor during her proffer that I didn't know Joe Burns,

17   okay.

18        Michael Dryden said that he met me at Shawndell's house

19   and I sold him an ounce of dope.  Well, if you look at the

20   proffer, Joe Burns didn't know Shawndell during the time that

21   Michael Dryden said that he was at her house.  They didn't know

22   each other yet.  They didn't meet until the middle of December

23   and so it's -- it couldn't have happened.

24        It just -- it tells the truth.  The proffers tell the

25   truth if you read through them.  And so that's why I get so

1    angry is because the truth wasn't told, and -- and I -- I

2    didn't have a chance to even try to -- to tell the truth, and

3    that's -- that's why I'm angry, you know.

4        I just think there's been a lot -- a lot of wrong that --

5    and I'm not blaming you.  I -- I just -- and I'm not blaming my

6    attorney, even though I do get mad at him.  It's just the way

7    things -- I was blindsided.  I did not know that they could get

8    up on the stand, narrate a story, never get objected to and

9    tell such lies that weren't true without some type of

10   corroboration.

11       None of the stories corroborate each other.  None of them.

12   Nobody says the same exact same.  And I just don't understand

13   how a person can be convicted like that.

14       And so, therefore, I think there's prosecutor misconduct.

15   I think Miss Fullerton coached Shawndell throughout her

16   proffer.  It was obvious when she got on the stand.

17   Miss Fullerton coached her through, and it all sounded pretty

18   good until my attorney cross-examined her, and then she got

19   lost, she didn't know what she was talking about because it was

20   all made-up lies.

21       Shawndell told me on the way up here -- I know you don't

22   believe this, but she told me on the way up here that

23   Miss Fullerton wanted her to say that she lived in the garage

24   with me.

25       Well, I believe that during the trial she did say that at

1    the first, but then at the end she counterdicted [*sic*] herself

2    and said, no, she never did live there.  So, you know, there's

3    just lots of things that -- that if you was to know the truth,

4    you could spot the truth, and -- and you could spot the lies

5    easily.

6        But when you got five people up there making up stories

7    and -- and nobody objects to it, I don't know how -- how the

8    truth's ever going to come out.  You know, nobody got the

9    chance to object.  The jury heard all that and believed every

10   word of it because nobody said "objection", nobody said "that's

11   not true", and that's the reason I wish I would have took the

12   stand.

13           THE COURT:  All right.  I hear you there.  Is there

14   anything you want to tell me about what your sentence should

15   be?

16           THE DEFENDANT:  Yeah.  Send me home.  That's what I'd

17   like to tell you, but I know that won't happen.  So, you know,

18   do what you got to do I guess is what I'm saying.

19           THE COURT:  All right.  All right.  Very well.

20           THE DEFENDANT:  But just take in consideration all

21   that.

22           THE COURT:  I'm taking into consideration --

23           THE WITNESS:  They all --

24           THE COURT:  -- everything I saw --

25           THE DEFENDANT:  They all --

 1              THE COURT:  -- and heard --

 2              THE DEFENDANT:  -- get up on the stand and lie like

 3    that because they know they're going to get a break so why

 4    wouldn't they tell the biggest lies ever?

 5              THE COURT:  All right.  I've heard everything.

 6         Counsel, is there any reason that sentence should not now

 7    be pronounced?

 8              MS. FULLERTON:  No, Your Honor.

 9              MR. DAMMAN:  No, Your Honor.

10              THE COURT:  All right.  Very well.  Well,

11    Mr. Mazzulla, I have considered and reviewed all of the

12    statutory 3553(a) factors for sentencing, including the

13    unnecessary sentencing disparities.  I've considered all of the

14    factors.  Your role in this particular crime as well as your

15    individual history, your characteristics.  I'm not going to

16    give you a lengthy lecture.  This is -- this is not your first

17    rodeo.

18         You exercised your right to trial by a jury of your peers

19    and you were found guilty on -- on three counts based on the

20    evidence that was adduced in this courtroom and so here we are.

21         The sentence I'm about to pronounce in this case reflects

22    the -- the nature of this crime, the -- the amount of time that

23    was involved in this particular crime, the number of people

24    that were affected by the sales of -- of the methamphetamine,

25    but I also am considering -- when I say the nature of the

1    crime, you were not a drug kingpin from -- from Mexico living

2    in a $900,000 home, so I'm considering all of that in my

3    sentencing determination.

4        I'm considering your -- your prior record which quite

5    frankly is atrocious.  It includes multiple drugs, weapon

6    offenses, terroristic threats, basically, the -- the Trifecta,

7    but I am considering that.  And the need to promote respect for

8    the law.

9        Now, while you are in prison, I will give you the

10   opportunity to participate in something gainful if you wish to

11   do so, so an educational or vocational program as well as the

12   drug treatment program.  That's known as RDAP.

13       There was a period of time, and I read all about it, where

14   you were at the -- the Berean church in a program, and so you

15   were participating in a sober lifestyle at one point in time,

16   and I'm going to give you the opportunity for RDAP in this

17   particular sentencing.

18       But now to the sentence.  To reflect the seriousness of

19   the offense, to promote respect for the law and to provide just

20   punishment for this particular offense, recognizing that the

21   guidelines are advisory in nature, and considering all of the

22   sentencing -- the statutory goals for sentencing, and in many

23   ways in spite of yourself, I hereby sentence the defendant,

24   Rodney P. Mazzulla, to a term of 312 months as to all counts,

25   to be served concurrently all with each other.

 1          Because of your history of substantial drug abuse, I am

 2     going to recommend to the Bureau of Prisons that you

 3     participate in the 500-hour intensive drug treatment program or

 4     any similar and available drug treatment program.

 5          I will recommend to the Bureau of Prisons that you be

 6     incarcerated in a federal facility -- I assume as close to

 7     Lincoln, Nebraska, counsel?

 8          MR. DAMMAN:  He'd like the Court to recommend

 9     Florence, Colorado.

10          THE COURT:  All right.  I will make that

11     recommendation.  As you know our -- the Bureau of Prisons will

12     classify you and place you as appropriate.  I will make the

13     recommendation for Florence, Colorado.

14          I'll also recommend to the Bureau of Prisons that you be

15     provided an opportunity to obtain further educational or

16     vocational training appropriate to your current education or

17     skill level.

18          You'll be placed on five years of supervised release on

19     all counts, to be served concurrently with each other count,

20     when you're released from prison and I intend to follow the

21     special conditions of supervised release set out in the

22     Sentencing Recommendation.

23          Counsel, do you have any objection to those?

24          MS. FULLERTON:  No, Your Honor.

25          MR. DAMMAN:  No, Your Honor.

```
 1              THE COURT:  All right.  The special conditions of

 2      supervised release set out in the Sentencing Recommendation are

 3      therefore imposed as well as the standard conditions.

 4          I'm not going to impose a fine because the defendant

 5      cannot pay one and is not expected to be able to pay one in the

 6      foreseeable future.

 7          A $100 special assessment will be imposed on each count

 8      for a total $300 special assessment.

 9          And the defendant should be given -- just a moment.

10      Mr. Mazzulla shall be given credit for time served and I

11      believe he's been detained since April 22 of 2017.

12              MR. DAMMAN:  That's correct.

13              THE COURT:  All right.  And he should receive credit

14      for that time served.

15          And if not already done so, he shall cooperate in the

16      collection of a DNA sample at the direction of the Bureau of

17      Prisons.

18          Now, in crafting this order, I have considered all factors

19      in determining that this sentence should be sufficient but not

20      greater than necessary to comply with the purposes of Section

21      3553(a).

22          That is my judgment and sentence.

23          Counsel, do either one of you have any questions or wish

24      any further elaboration of my Statement of Reasons?

25              MS. FULLERTON:  No, Your Honor.
```

1              MR. DAMMAN:  No, Your Honor.

2              THE COURT:  Very well.  Mr. Mazzulla, you have a

3     right to appeal this matter to a higher court and you have 14

4     days in which to file an appeal.  If you wish to do so, you

5     should talk with your lawyer or you can file it on your own

6     behalf, but you have 14 days in which to file an appeal.

7         In just a moment, my courtroom deputy's going to give you

8     a sheet of paper that sets forth your appeal rights, but they

9     are what I just told you.  You have 14 days to appeal the --

10    the trial verdict, any of my judgments or the sentencing in

11    this particular matter.

12        Do you have any questions about your right to appeal or

13    the procedures involved?

14             THE DEFENDANT:  No, sir.

15             THE COURT:  All right.  Very well.  Are there any

16    questions or any other matters that need to be taken up?

17             MS. FULLERTON:  No, Your Honor.

18             MR. DAMMAN:  No, Your Honor.

19             THE COURT:  All right.  Very well.  If not, the

20    defendant is remanded to the custody of the United States

21    Marshal for service of sentence.

22        And we'll stand adjourned.

23        Marshal, if you will pass on to the transporter, I do not

24    want this defendant being transported, wherever he's being

25    transported, with any of the witnesses that testified.

1          DEPUTY MARSHAL:  Will do, Judge.

2          THE COURT:  Is that clear to everyone?  Thank you.

3     We stand adjourned.

4     (Adjourned at 12:36 p.m.)

5

6

7                          * * * * * * *

8

9

10    I certify that the foregoing is a correct transcript from
      the record of proceedings in the above-entitled matter.

11

12        /s/Rogene S. Schroder              September 12, 2018
          Rogene S. Schroder, RDR, CRR            Date

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                              I-N-D-E-X

 2                     Direct  Cross  Redirect  Recross

 3   WITNESSES:
     FOR THE PLAINTIFF:
 4
     James Sisneroz            19      22       30
 5
     Shawndell Burke          33      41       49        50
 6
     Michelle Schwab          52      56       60
 7

 8   WITNESSES:
     FOR THE DEFENDANT:
 9
     Rodney P. Mazzulla       62
10

11

12   EXHIBITS:                              Offered      Ruling

13   59.   Evidentiary Basis Table             4           5

14   60.   Saline County Incident Report, 11/16/17   16         17

15   61.   U.S. Marshal Service Report of
           Investigation, 4/12/18              16         17
16
     62.   Saline County Incident Report, 4/18/18    16         17
17
     63.   Saline County Incident Report, 4/18/18    16         17
18
     64.   Saline County Incident Report, 4/29/18    16         17
19

20

21

22

23

24

25
```